THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* RAY CLEMENTS, Plaintiff in Error.

*Opinion filed February 17, 1925—Rehearing denied April 14, 1925.*

1. CRIMINAL LAW—*some defendants may be found guilty of murder and the others of manslaughter.* It does not necessarily follow that because some of the defendants in a murder trial are found guilty of murder that the others must either be found guilty of murder or acquitted, as the evidence may justify a verdict of manslaughter. (*People* v. *Schultz*, 267 Ill. 147, distinguished.)

2. SAME—*one who is guilty of manslaughter cannot complain that he was not found guilty of murder.* A defendant in a murder trial who is guilty of manslaughter, as found by the jury, cannot complain on review that he was not found guilty of murder.

3. SAME—*one cannot complain of error he has induced.* A defendant in a criminal case who induces the trial court to give an instruction or to proceed in some specific manner cannot assign as error the ruling or action of the trial court so induced.

WRIT OF ERROR to the Circuit Court of Franklin county; the Hon. GEORGE A. CROW, Judge, presiding.

R. E. SMITH, for plaintiff in error.

EDWARD J. BRUNDAGE, Attorney General, ROY C. MARTIN, State's Attorney, and GEORGE C. DIXON, for the People.

Mr. JUSTICE HEARD delivered the opinion of the court:

Plaintiff in error, Ray Clements, and Joe Worsham, John Lowe, Delmar Simpson and Edward Zappe, were jointly indicted and tried in the circuit court of Franklin

county, Illinois, for the murder of John Heral Byrn. The jury returned a verdict finding the defendants Worsham, Lowe and Simpson guilty of murder and the defendants Zappe and Clements guilty of manslaughter. In accordance with the verdict, as motions for a new trial and in arrest of judgment had been overruled, Worsham and Lowe were sentenced to the penitentiary for life, Simpson was sentenced to the penitentiary for a term of twenty years, and Zappe and Clements to an indeterminate term in the penitentiary. The record of the trial court has been brought to this court for review upon writ of error by plaintiff in error, Ray Clements, alone.

The plaintiff in error contends that as three of his co-defendants were convicted of murder he was either guilty of murder or not guilty of any crime, and relies upon *People* v. *Schultz,* 267 Ill. 147, as the basis of his contention that it was error to submit to the jury the question of his guilt of manslaughter and to sentence him for manslaughter. This case differs materially from the *Schultz case,* where the court at the request of the State gave instructions upon the subject of manslaughter, and told the jury that under the indictment they might find the defendant guilty of murder or of manslaughter or not guilty, although all the proof showed that if he committed the homicide he was guilty of murder, and there was "not one particle of evidence to justify reducing the crime to manslaughter." In the present case the court gave no instructions to the jury, at the request of the State, upon the subject of manslaughter, but did give, at the request of defendants, an instruction defining manslaughter and also an instruction giving the jury to understand that they might find defendants guilty of murder or of manslaughter. In view of the evidence given by defendants other than plaintiff in error (who did not testify) as to the circumstances surrounding the commission of the offense, the court could not properly have refused to give the instruction on the subject of manslaughter. It does not nec-

essarily follow that because some defendants in a murder case are found guilty of murder their co-defendants must either be found guilty of murder or not guilty. A state of facts might easily be conceived under which two persons might be indicted as principals on the charge of murder and one of them be properly convicted of murder and the other of manslaughter. If plaintiff in error was guilty of murder he cannot complain in this case because he was found guilty of manslaughter. (*Foglia* v. *People,* 229 Ill. 286.) In the present case, unlike the *Schultz case,* the instructions upon the subject of manslaughter were given at the request of the defendants and not of the State. It is a well settled principle of law that a party will not be allowed to take advantage of his own wrong or of an error of the court induced by his own motion. If it was error to instruct the jury upon the question of manslaughter and to submit to the jury the question of plaintiff in error's guilt of the crime of manslaughter, plaintiff in error invited the error, and having done so must accept its results. He can not ask the court below to make a specific ruling or to proceed in a certain manner and then successfully assign as error in a court of review that the ruling or action of the court is erroneous. *Sheridan* v. *City of Chicago,* 175 Ill. 421; *Union Traction Co.* v. *Lundahl,* 215 id. 289; *People* v. *Darr,* 262 id. 202; 2 R. C. L. 238.

The murder was committed in the bar-room of a "soft drink" establishment kept by Albert Bradley in the town of Pershing, in Franklin county. Bradley's place faced west and was a one-story building of five rooms,—a bar-room, dining-room and three bed-rooms. The west room was the bar-room, twenty-six feet north and south and twenty feet east and west. In it were a bar, a kitchen cabinet, a stove and an ice-box. Back of this room were a dining-room and a bed-room and in the rear two bed-rooms. On the night of April 2, 1922, between 11 and 12 o'clock, Byrn with two girls came to the Bradley place in his Essex car. He

left the car stand by the side of the road and with the girls entered the rear door of the place. The two girls remained in the northeast corner room and Byrn went to Bradley's room. Shortly thereafter another girl came and went into the southeast bed-room, where there were two girls, one of whom was Helen Worsham, sister-in-law of the defendant Worsham and an assistant to Bradley. About 12 o'clock a knocking was heard at the front door, and Bradley told Helen Worsham to go and see who was there. She went into the front room, and after some words the door was forced open and plaintiff in error and his four co-defendants entered the room. About this time Bradley appeared on the scene, followed by Byrn. The defendants demanded liquor. Bradley told them he did not have any but would see if he could get some. The defendants then saw Byrn, and one of them said, "There is a policeman." Another said, "It is the motorcycle cop." A wrangle then ensued, in which Worsham accused Byrn of having "snitched on my brother," and knocked him down. Revolvers were then drawn, at least three or more of the defendants having revolvers, as did Byrn. Bradley and Helen Worsham fled from the room and in a short time left the house, as did also the two girls who were in the southeast bed-room. A fight then ensued in the bar-room, in which it was evident from the noise and the voices several persons were taking part. One of the defendants said, "Make him pray." Byrn said, "I will do anything you want." Another said, "Pray, then." Byrn said, "Oh, Lord! Lord!" which was followed by a moaning sound and revolver shots. Byrn's body was dragged from the room, placed on the rear of his automobile, between the spare tire and the body of the car, with the feet dragging on the ground, and the car was driven about two miles, where it and Byrn's body were found a few hours afterwards, in a ditch. Byrn's body had a gun-shot wound in the center of the upper lip. There were two other bullet wounds on Byrn's body,—one over the left temple and

one just back of the left ear. Both bullets penetrated the brain and brain was oozing out of both of the bullet holes. All three bullet wounds were powder burned. The bullet wounds were not all made by the same size bullets. There were six or seven cuts on Byrn's head. About 8:30 o'clock of that evening Byrn had a watch and about $40 in bills upon his person. When the body was found all that was upon his person was ninety cents and a key.

An examination of the front room of the Bradley place after the murder showed that on the kitchen cabinet, which was at the east end of the bar, at the northeast corner of the room, there was blood, starting about the top of the door and running down to the floor. On the floor near the door there was a big puddle of blood and brains. In front of the bar there was a large quantity of blood. East of that place a short distance there was another puddle of blood and brains. In the extreme south of the room there was blood against the wall and a bunch of hair sticking against the wall with the blood. There was a small portion of blood in front, close to the wall, and there was another pool of blood a short distance out from the bar, and streaks of blood continued on the floor and on the steps and a trail of blood led to where Byrn's car had been standing. In the bar-room there was a cooking vessel sitting on the bar, about half full of bloody water. There was also a bucket about half full of bloody water and a pitcher with bloody finger prints all over it. After the murder plaintiff in error, Worsham and Zappe left Pershing and went to Weaver, where plaintiff in error and Zappe slept the remainder of the night on a pool table. They informed the proprietor of the place that they had just come from Zeigler. The defendants were all arrested the next morning, and when arrested the clothing of all of the defendants was smeared with blood. There were spots of blood on plaintiff in error's coat and a smear of blood on his shirt, near the waist line. Plaintiff in error's coat and shirt were taken from him and introduced

in evidence.   Notwithstanding the fact that the evidence shows that plaintiff in error had been in the company of many people after 10:30 on the night of April 2, the only explanation attempted to be given of this blood on his clothing is by the testimony of a taxi driver living in Orient, who says that he saw plaintiff in error at a place called "The Yellow Dog," about 10:30 o'clock, and that he noticed at that time that his face was bloody around the nose. There was no testimony in the record that there was any blood upon plaintiff in error's clothes prior to the time he went to Bradley's, although he had been in the company of several of the witnesses in the meantime.   While his co-defendants testified that plaintiff in error took no part in the fight, their testimony in other respects was entirely discredited and the jury were warranted in giving no credence to it.

No complaint is made as to the admission or exclusion of evidence, the giving or refusal of instructions, misconduct of counsel, or that in any respect plaintiff in error did not have a fair and impartial trial before a fair and impartial jury.   The undisputed facts show that for about an hour prior to the killing plaintiff in error and his co-defendants were together at a near by resort;  that he knew they were armed with revolvers;  that they went together to Bradley's;  that he joined with them in making a forcible entrance;  that they were engaged upon an unlawful errand; that he was present in the room when the quarrel started; that several people took part in the fight;  that after the killing he went, with two other parties who had participated in the killing, to another town;  that he there gave a false account of his previous whereabouts.   The jury saw and examined the unexplained blood spots on his clothing and were fully warranted by the evidence in finding him guilty.

The judgment of the circuit court is affirmed.

*Judgment affirmed.*