26 June 2000

NO. 5-98-0810

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

________________________________________________________________________

THE PEOPLE OF THE STATE OF ILLINOIS, )  Appeal from the

)  Circuit Court of

     Plaintiff-Appellee, )  Montgomery County.

)

)  No. 97-CF-11

)

JODI FELDMANN, )  Honorable

)  Michael P. Kiley,

     Defendant-Appellant. )  Judge, presiding.

________________________________________________________________________

JUSTICE KUEHN delivered the opinion of the court:

There is an old adage that cautions restraint in what we seek.  Its message draws upon the irony that can sometimes mock a successful pursuit.  This is a case in point.  The defendant asked the trial judge to allow for jury deliberation on the question of guilt for the offense of involuntary manslaughter.  The trial judge honored that request.  The jury deliberated and resolved the question against the defendant.  It found her guilty.  

The defendant now challenges a guilty verdict of her own making.  She asks us to undo the verdict because it makes no sense.  With a rather remarkable turn in position, the defendant argues that justice would have been better served had the jury attributed guilt for the offense of first-degree murder.  The facts of this case could at least support such a verdict.  They do not support attribution of guilt for involuntary manslaughter.

Thus, the defendant maintains that she has been held to account for involuntary manslaughter–a crime that she could not possibly have committed.  We are asked to correct this iniquity by reversing her conviction. 

On July 30, 1996, the defendant gave birth to a daughter, posthumously named Judy Feldmann Frerichs.  Judy's stay on this earth was short-lived.  Her life's journey consisted of a few breaths of fresh air followed by a headlong plunge into the uninviting waters of a toilet bowl.  The varied pleasures that life had in store for Judy were forever lost when a mother's hand flushed them away.  Judy's lungs filled with toilet water and she drowned. A first-

degree-murder prosecution ensued.  There was no dispute over the fact that Judy was born alive and well.  The only uncertainty was whether Judy's lungs drew air for several minutes or only a matter of seconds before toilet water invaded them.  The answer to life's duration depended upon where Judy's delivery occurred.  The State and the defense presented two divergent views on where her birth took place.  

The prosecution's theory commended a finding of first-degree murder.  According to the State, Judy was born in the bedroom of the defendant's apartment.  After Judy's birth, the defendant carried Judy into the bathroom and deliberately deposited her into the toilet bowl.   The defense theory called for acquittal.  According to the defense, the defendant was as innocent as the daughter she never knew.  Unaware of her pregnant condition, the defendant went to the bathroom in order to answer what she thought was a normal urge for its use.  The defendant delivered Judy into the toilet bowl without knowing it.  Judy's presence went undiscovered.  Mother and child alike were victims of a tragic accident.

After a two-week trial, a Montgomery County jury deliberated to a verdict.  It returned a verdict of guilt, but not for the offense of murder.  The jury found the defendant guilty of involuntary manslaughter.  The trial judge imposed a four-year prison sentence upon that finding of guilt. 

This appeal seeks an outright reversal of the conviction, based upon the total absence of evidence from which to conclude that the defendant performed any act with a reckless state of mind.  Under the State's theory of the case, the jury should have concluded that the defendant deliberately placed her newborn baby into the toilet bowl, an act that could not be done without knowledge of impending death or great bodily harm.  Under the defense theory of the case, the jury should have concluded that the defendant was oblivious to the situation and, hence, lacked a state of mind necessary to offend the law.  Instead, the jury concluded that the defendant's criminal recklessness caused Judy's death.  

The defendant allows for one other possibility.  The jury may have found it hard to believe that she could deliver a full-term baby without knowing it.  The jury may have concluded that she was indeed ignorant of her pregnant condition, commenced an unwitting delivery while on the toilet, but became aware of her circumstance during the delivery process.  If so, the jury would have had to conclude that the defendant took no action on Judy's behalf and allowed her to fend for herself in the toilet bowl.  The defendant argues that this alternative to the contrasting theories offered at trial warranted  a finding of murder,  rather than involuntary manslaughter.  If the jury believed that the defendant became aware of Judy's existence and, thereafter, delivered her into the toilet bowl and left her there, it had to conclude that knowledge of impending death or great bodily harm accompanied the defendant's omission. 

In essence, the defendant's position is this.  Although the State's evidence harbored the potential for a first-degree-murder conviction on either of two bases,  the jury did not find the defendant guilty of murder.  The jury rejected the State's theory of death's circumstance.  The only other theory presented was one of innocence.  To the extent that this theory could have been rejected as well and the jury could have believed that the defendant discovered Judy during the delivery process, the jury could not conclude that the defendant acted recklessly.  If the defendant was aware of Judy's impending arrival, she had to be aware of the inevitable outcome that a failure to act would produce.  Hence, the jury verdict bears no connection to the evidence presented at trial.  The jury engaged in a pure compromise in order to reach its verdict.  

Based upon the total absence of an evidentiary foundation to support the guilty verdict, the defendant concludes that her conviction must be reversed.  She maintains that the State cannot punish her for a crime not committed, a crime that the State did not, and cannot, prove.  

We are not asked to address what we believe to be the controlling issue in this case.  The State did not seek deliberation on the crime of involuntary manslaughter.  The trial judge did not allow for it by the exercise of his independent authority to instruct on a lesser-

included offense.  See 
People v. Garcia
, 188 Ill. 2d 265, 276-77, 721 N.E.2d 574, 583 (1999).  There is only one reason that the jury pronounced guilt for involuntary manslaughter, only one reason that the defendant stands convicted of that offense.  The defendant pursued, and successfully secured, a ruling that empowered the jury to find that the defendant committed involuntary manslaughter. 

The State joins the question raised and invites us to examine the evidence presented in order to determine whether a rational jury could conclude that the defendant committed the crime of involuntary manslaughter.  Although the outcome of this case does not depend upon whether the evidence adduced at trial was legally sufficient to support an involuntary manslaughter conviction, the arguments presented are instructive.  We think it worthwhile to examine them. 

The State's theory of the defendant's guilt is chilling.  It speaks of a patient plan executed by a powerfully motivated killer.  It speaks of a cold-blooded murder.  At trial, the State tried its best to convey that message.  It pursued the following theory about what happened.  This is the State's view of how Judy died and what motivated her unnatural death.

The defendant disdained motherhood.  She was single, was 19 years old, and had no room in her life for a child.  This was her second pregnancy at a young age.  She deliberately terminated her first pregnancy after 7½ months of gestation.  Shortly after an abortion freed her from motherhood, she discovered that she was pregnant again.  This time an abortion would not do.  This time the defendant decided to employ another device to avoid motherhood.

The defendant devised a plan for Judy's death.  No one would ever know that she was pregnant or that she gave birth.  She would conceal the pregnancy.  To this end, she purchased girdles and other restrictive undergarments.  They maintained her shape and prevented a pregnant look.  In the event that anyone might detect uncommon weight gain, she deflected suspicion by pretending to be on her period and asking friends, on more than one occasion, to borrow tampons.  She scrupulously avoided physicians and engaged in no prenatal care.  As Judy slowly grew to a full-term baby, the defendant kept Judy's presence a complete secret.  She concealed the pregnancy for its entire term.  All the while, she anxiously awaited the day when Judy would arrive. 

On July 30, 1996, the defendant went into labor.  The plan prohibited medical help.  As the time between labor contractions shortened, the defendant retired to her bedroom where the final stage of her murder plot was to play out.  There she labored to rid her body of Judy.  It was not easy.  Judy's passage tore open the flesh surrounding defendant's vagina, opening a three-inch gash on the right side and a two-inch gash on the left.  

Judy made her place of birth known.  She marked it with blood and meconium, a sterile, tarry substance routinely extruded from a newborn's intestines immediately after birth.

After the defendant delivered Judy, she rose from her bed, gathered up Judy and the placenta, and wrapped them into a pillowcase.  The defendant carried Judy and her earlier lifeline into the bathroom and deposited them into the toilet bowl for disposal.  When she flushed the bowl, she accomplished her long-awaited goal.  She escaped motherhood again.  This time, the method that she employed constituted murder.

The defendant made two miscalculations that prevented the murder from going undetected.  When the placenta and Judy slid out of the pillowcase and into the toilet bowl, the defendant realized that Judy was not going to accommodate her plan for the disposal of the body.  Judy was much larger than the defendant had anticipated.  This was not a baby terminated after 7½ months of gestation.  This baby had grown to full term.  Judy was not going to disappear into the sewer system.  The defendant also underestimated the physical toll that an unassisted full-term delivery would take on her body.  The delivery process involved exertion and physical damage that far exceeded what the defendant experienced during her abortion.  The defendant quickly, and correctly, sensed an urgent need for medical attention.  She had lost vast amounts of blood.  She had to seek medical help before she could properly attend to the remnants of her misdeed.  She hastily left her apartment, leaving the evidence of what occurred there locked behind the apartment door.  The murder scene would have to be attended to later.  The defendant first had to attend to her own survival.  

When the defendant arrived at the hospital emergency room, she attempted to maintain her secret.  All that she reported was vaginal bleeding.  She attributed her vaginal condition to an episode of rough sex.  Her body belied the reported history.  Her darkened nipples, stretch-marked stomach, enlarged uterus, and torn vagina spoke to recent childbirth after a full-term pregnancy.  The truth unraveled.  In short order, Judy was discovered and law enforcement authorities processed the murder scene.    

The foregoing was what the State had hoped to prove when it charged the defendant. During the trial, it was prohibited from presenting certain evidence in support of its theory.  The State was only allowed to reveal that there was a prior pregnancy.  The State was not allowed to mention that the defendant carried another child for 7½ months or that the prior pregnancy was deliberately terminated.  In addition, the State was prevented from telling the jury of a rather singular purchase made by the defendant just hours before Judy's birth, within that time frame that labor was likely to have commenced.  

The State wanted to introduce a receipt of purchase to show that the defendant bought one item, and one item alone, approximately eight hours before Judy's delivery.  That item was a toilet bowl plunger.  The State argued, without success, that the timing of the purchase established the receipt's relevancy on the issue of knowledge and design.  Of all the days on which the defendant might have found the need to own a toilet bowl plunger, her need arose on the one day that a newborn baby found its way into her toilet bowl.    

The State presented receipts that evidenced the defendant's purchase of girdles and other restrictive undergarments during the course of her pregnancy.  

The State also presented autopsy findings.  Those findings rendered unknown childbirth implausible.  Judy's size negated the defendant's claim of unwitting labor and delivery.  Judy weighed seven pounds, three ounces.  Her head measured 13 inches in circumference.  Her body measured 19 inches in length.  Judy's delivery necessitated nonsurgical extension of the birth passage.  Her head exerted sufficient pressure on the vaginal wall to rip it open.  The State introduced opinion evidence that Judy's delivery would have produced sufficient pain to command attention to her arrival.

The State also presented the evidence left at the crime scene.  First, there was the bedroom.  There was a jumper still in its hanger on the bed.  Underneath it were two blood-

soaked towels, one of which was stained with meconium.  At the foot of the bed was a laundry basket that contained numerous items, some of which were obviously removed from the bed in haste.  There were two sheets, a quilt, a garment, and various towels.  There was also a bloodstained pillow, with the pillowcase removed.  The quilt was under the pillow.  It was heavily stained with blood and meconium.  Only a portion of the quilt was stuffed into the basket.  One end of the quilt was stuck to the wall next to the bed.  The adhesive that held the quilt to the wall was a thick and tarry mass of meconium.  There was also a blood-soaked towel stuck to the wall.  The adhesive was again dried meconium.  One of the sheets was only partially stuffed into the basket.  It was not completely removed from the bed, one end remaining tucked under the bed mattress.  It was also heavily bloodstained.  There were five towels and a gray shirt found in the basket, all of which were bloodstained.   

In contrast to the soiled and bloodied bedroom, the bathroom was remarkably clean.  Judy rested in the toilet bowl atop the umbilical chord and placenta.  She appeared to have followed the placenta's entry into the bowl, an impossible circumstance if delivery occurred directly into the toilet.  There was an inverted toilet bowl plunger next to the toilet.  There was also a waste basket next to the toilet.  It contained a pillowcase and a towel.  Both were thoroughly soaked with water but still contained bloodstains.  The pillowcase also contained meconium.  There was no accumulation of blood anywhere in the bathroom.  

Based upon this evidence, the crime scene technician who processed the apartment observed that Judy's birth had to have occurred in the bedroom.  She emphasized the large amount of meconium in and around the bed.  It was thick and sticky, was caked to the wall, and had not been diluted in any fashion.  Based upon its consistency, it could not have been transferred from the toilet.  Moreover, she could not account for the large accumulations of blood, bloodied items, and deposits of meconium on the bedroom walls if the birth had occurred in the bathroom.  The crime scene technician opined that the defendant gave birth in the bedroom and carried Judy and the placenta into the bathroom for disposal.  She believed that the absence of blood on the bathroom floor, and the water-soaked pillowcase that contained blood and meconium remnants present in the bathroom wastebasket, suggested that the defendant used the pillowcase for transport.

This was the State's case.  It clearly pointed the way to a different verdict than the one reached.  Notwithstanding, the State contends that its evidence, rather than any of the  evidence presented by the defendant, provides a basis for the jury to have rationally concluded that the defendant committed involuntary manslaughter.  

The State refuses to accept the credence of any evidence submitted on behalf of the defendant when it hypothecates a rational path to an involuntary manslaughter verdict.  It holds steadfast to its theory of where childbirth occurred.  It is convinced that the jury had to have concluded that the defendant delivered Judy on the bed, carried her into the bathroom, and deliberately placed her into the toilet bowl.  

The State notes an absence of evidence to establish that the defendant knew that Judy was born alive.  Therefore, the State concludes that the verdict must rest upon a jury finding that the defendant acted recklessly in her failure to ascertain Judy's condition before she deliberately threw Judy into the toilet bowl.

This position is untenable.  We know that Judy was alive when she entered the toilet bowl and that she drowned in its water.  The State insists that the defendant deliberately put her there.  

A rational jury could not conclude that the defendant drowned Judy by deliberately depositing her into a toilet bowl but committed only involuntary manslaughter because of a failure to determine whether Judy was dead or alive before doing so.  Judy did not die because the defendant failed to determine her condition.  She died because she found her way into a toilet bowl and drowned.  

When someone performs acts that present a knowing probability of death or great bodily harm to another living human being, and those acts indeed cause the death, it is murder, not involuntary manslaughter.  It matters not whether the actor fails to first determine the intended victim's condition.  It is sufficient if the intended victim was indeed alive.  Nor does ignorance of a victim's condition somehow diminish the knowing state of mind with which the death-producing act is performed.  It does not reduce a deliberate and knowing act to an act performed recklessly.  

If an invalid old man in a wheelchair, asleep and resting peacefully in his home, dies after a burglar fires a .22-caliber bullet into his chest, the crime is murder.  Any failure to first determine whether the aged target is dead or alive does not alter the conduct that causes death or the state of mind that accompanied that conduct.  The omission bears no connection to why the death occurs.  Since the omission is not what produces the death, it is not the conduct we use to measure the actor's state of mind.  See, 
e.g., People v. Davis
, 95 Ill. 2d 1, 447 N.E.2d 353 (1983).  The State's reasoning would invite the tender of involuntary manslaughter verdict forms in all manner of killings where their submission to a jury would be clearly inappropriate.

We think that the State's case might easily have sustained a first-degree-murder conviction.  However, we fail to see how a jury could rationally conclude that the defendant committed involuntary manslaughter.  Any mother who places her newborn baby into a toilet bowl, or who allows her newborn baby to remain there after a delivery into the bowl, knows that she is committing acts that can produce death or great bodily harm.  If they do, she commits murder. 

We agree with the defendant when she argues that any guilt attributed to her, based upon the evidence adduced at trial, should have been guilt for the crime of murder.  There was absolutely no factual basis for concluding that she acted recklessly. 

There is certainly room for debate over whether the defendant's conviction for an offense that she did not commit, and that the State did not prove, constitutes bad or good fortune.  Either way, we will not overturn her conviction. 

It was defense counsel who implored the trial judge to submit the involuntary manslaughter instruction and verdict form.  After the State's Attorney questioned the evidence of recklessness to support such an instruction, defense counsel was adamant in calling for its submission.  The trial judge was told as follows:

"Judge, I think there are numerous different factual circumstances that fit in this particular case with regard to the definition of involuntary manslaughter.  *** [C]ertainly the jury under these circumstances could believe that it was an unintentional killing.  ***  There is [
sic
] a number of deviations or interpretations of the factual circumstances that we have before us that can be construed as a reckless act.  And I think that the definition of involuntary manslaughter does fit the factual circumstances that we have here.  ***  I think this is replete with facts that justify this."

Amidst these confident assurances, defense counsel advanced numerous theories of how the jury could arrive at an involuntary manslaughter verdict.  She suggested that the jury could find that the defendant acted recklessly by carrying a baby for nine months without prenatal care, by giving birth at home without medical attention, or by giving birth into a toilet bowl.  She even suggested that the jury could believe the State's theory of events but find that the defendant acted with a reckless state of mind.  This suggestion called for the jury to conclude that the defendant, while mentally and physically incapable of forming an intent to kill, retained the mental capacity to consciously disregard the risk created by placing Judy into the toilet bowl.

The trial judge gave the involuntary manslaughter instruction and verdict form at the defense counsel's urging.  Later, the defendant acknowledged that it was her desire that the trial judge submit the requested instructions and allow the jury to deliberate on her guilt for the offense of involuntary manslaughter.  

The arguments tendered in support of the involuntary manslaughter instruction and verdict form were as fallacious as the State's earlier argument.  This was not a case where a mother-to-be bypassed prenatal care and lost her baby because of it.  It was not a case where a mother-to-be decided to have her baby at home rather than in a hospital and lost the baby because of it.  We question whether either situation would necessarily constitute a crime under the laws of this State.  Regardless, Judy did not die because the defendant failed to engage in prenatal care.  She did not die because of a homebound delivery.  Judy died because she drowned in a toilet bowl.  

The circumstances of this case allowed the jury to conclude that the defendant deliberately placed Judy into that toilet bowl, that the defendant was totally unaware of Judy's delivery and life-threatening predicament, or that the defendant became aware of Judy during the delivery process and failed to act.  We agree with appellate counsel when he argues that a mother who, conscious of impending childbirth, gives birth into a toilet bowl and allows her daughter to remain there to drown does not act recklessly.  We also fail to see how a mother could place her newborn baby into a toilet bowl without knowing the consequence yet retain sufficient mental capacity to consciously disregard the substantial risk of death or great bodily harm that such an act created. 

When it became time for the jury to deliberate on the facts of this case, the defendant wanted the jury to consider involuntary manslaughter.  The basis of her request did not justify its submission to the jury.  Nevertheless, she successfully urged that it was the just and fair thing to do.  

Although justice may have been better served had the trial judge refused the defendant's request for an involuntary manslaughter verdict form, it is difficult to fault the trial judge's decision.  While the State questioned the evidence of recklessness, it did not offer any real resistance to the defendant's desire.  The result reached after a contentious two-

week trial was certain to be held for naught if the trial judge erroneously decided that the evidence failed to support the tendered instruction and verdict form.  Under the circumstance, he chose the safe course by resolving any doubt in favor of the defendant's pursuit.      

It is a well-settled principle of law that a party will not be allowed to take advantage of her own wrong or of an error induced by her own motion.  See 
People v. Clements
, 316 Ill. 282, 284, 147 N.E. 99, 99-100 (1925).  The defendant maintains that the jury should not have considered involuntary manslaughter in this case.  However, the error in submitting the question of defendant's guilt for the crime of involuntary manslaughter was error invited by the defendant.  Since the defendant asked for the jury to consider whether she committed involuntary manslaughter, she must accept the results.  See 
Clements
, 316 Ill. at 284, 147 N.E. at 99-100. 

A defendant cannot successfully argue for a lesser-included-offense instruction, allowing deliberation on whether that lesser-included offense was committed, and later challenge the sufficiency of the evidence to support a verdict in favor of the defendant's lesser guilt.  See 
People v. Curwick
, 33 Ill. App. 3d 757, 759-60, 338 N.E.2d 468, 470 (1975); 
People v. Robertson
, 34 Ill. App. 3d 762, 764, 340 N.E.2d 213, 215 (1975).  The defendant could not ask the trial judge to proceed in the manner employed and expect us to assign his favorable ruling as a reason to reverse her conviction.

We turn to the defendant's request for a new trial based upon assignment of trial error.

First, the defendant contends that she was denied a fair trial because the trial judge failed to fully instruct on the law’s definition of the word "act."  She argues that where an "act of omission" is at issue, as it was here, the jury must be told that a person may be found guilty for not acting only where the law imposes a duty to perform the act and where the duty holder is physically capable of performing it.  See Illinois Pattern Jury Instructions, Criminal, No. 4.14 (3d ed. 1992). 

We are not particularly concerned about jury confusion over a mother's duty to remove her drowning child from a toilet bowl.  However, there was some evidence to support the conclusion that the defendant was physically incapable of performing that duty.  The instruction was appropriate. 

The defendant's position on appeal is again at odds with the position she took before the trial judge.  She did not tender an instruction to provide the definition that she now claims needed to be given.  If she felt that the jury needed to understand how her physical inability to remove Judy from the toilet bowl affected her criminal responsibility, she should have said so during the jury-instruction conference.  Instead, she remained silent and did not raise the issue.  

As pertinent as this suggested instruction might have been to her defense, it was not the State’s responsibility to submit it.  Nor was it incumbent upon the trial judge to intervene and submit the instruction on his own.  See 
People v. Grant
, 71 Ill. 2d 551, 557, 377 N.E.2d 4, 7 (1978).  Had the defendant submitted the instruction, we are confident that the trial judge would have given it to the jury.  Since she did not do so, she has forfeited the right to complain.  Our Supreme Court has made it clear that "no party may raise on appeal the failure to give an instruction unless he tendered it at trial."  
People v. Tannenbaum
, 82 Ill. 2d 177, 180, 415 N.E.2d 1027, 1029 (1980).  

Finally, the defendant claims that it was error to allow the jury to know about her earlier pregnancy.  As previously noted, the trial judge significantly curbed what the State was allowed to show in this regard.  Nonetheless, the defendant maintains that even limited information about her prior pregnancy produced harm that rendered the trial unfair.  She argues that evidence of a prior pregnancy was totally irrelevant but conveyed highly prejudicial messages.  

Once again, this position is at odds with what the defendant pursued from the trial judge.  At trial, the defendant asked the court to bar proof of the abortion and of the prior pregnancy's duration.  She did not ask the court to bar evidence of the prior pregnancy's existence.  Once again, the defendant finds fault in a ruling that did no more than honor her request.  We choose to address her concerns even though they were never expressed to the trial judge. 

First, the defendant points out that the prior pregnancy spoke to her immoral character.  It revealed the fact that the defendant conceived a child out of wedlock.  This is a dubious concern.  The pregnancy at issue exposed the same character flaw.  Regardless of the prior pregnancy, the jury was going to learn that the defendant's morals did not stand in the way of premarital sexual intercourse.  

Next, the defendant argues that knowledge of the prior pregnancy allowed the jury to speculate about how that pregnancy terminated.  The defendant fears that the jury considered the possibility that she aborted her first child.  This potential prejudice was compounded by the fact that the prior pregnancy lacked relevancy.  At trial, the defendant adduced expert testimony that all pregnancies differ in nature.  Since no two pregnancies are exactly alike, it follows that the prior pregnancy was pointless information that the jury should not have considered.

The trial judge is the gatekeeper of what a jury hears in the way of evidence.  The admissibility of evidence rests within the trial judge's sound discretion.  We will not disturb the exercise of that discretion unless it is clearly abused.  See 
People v. Ward
, 101 Ill. 2d 443, 455-56, 463 N.E.2d 696, 702 (1984).  This is not such a case.

The trial judge made generous use of his discretion to reduce undue prejudice to this defendant.  It was clearly within his discretion to weigh relevancy against excessive prejudice and exclude evidence of the abortion and evidence of the prior pregnancy's duration, even though those facts were highly relevant on the question of this defendant's state of mind.  It was also clearly within the trial judge's discretion to have admitted a far more damaging version of the defendant's prior pregnancy.  He could have allowed evidence of the pregnancy's duration and the circumstances surrounding its termination.  

The defense mounted the claim that the defendant carried a baby to full term without knowing it, endured labor without knowing it, and gave birth without knowing it.  No two pregnancies may be exactly alike, but they do, as a rule, tend to share many common attributes.  Certain symptoms usually accompany pregnancy.  The defendant knew what it felt like to carry a child for 7½ months.  This prior long-term pregnancy reduced the likelihood that the defendant might have misread pregnancy's common signs for something else.  The prior pregnancy, and its duration, could have been weighed against the defendant's claim that she carried Judy to full term without knowing it.   

The use of an abortion to end a pregnancy is something that engenders strong views among our populace.  It is conduct over which jurors are apt to possess a bias.  This does not mean that a prior abortion, procured shortly before another child's death in a toilet bowl, lacks relevancy.  Prior to Judy, the defendant carried another baby almost to full term but decided to prevent a live birth.  The reason for that decision resided in the  defendant's desire to avoid motherhood.  She obviously did not want to raise a child.  Evidence of this state of mind, possessed in the not-too-distant past, bears weight on how and why the defendant's newborn baby ended up face down in a toilet bowl.  It provides the reason for Judy's death.

Since we are not fully aware of the State's strategy or how it intended to use this evidence, we mention one other possible use.  An abortion at 7½ months requires certain procedures that include the inducement of labor and the delivery of the aborted fetus.  Prior experience with labor and delivery was potentially relevant to the defendant's claim that labor and delivery occurred without her knowing it.  

Since the abortion was clearly relevant, it was admissible.  See 
People v. Monroe
, 66 Ill. 2d 317, 322-23, 362 N.E.2d 295, 297 (1977).  The trial judge ruled it out to avoid undue prejudice to the defendant.  He did not prohibit its use on the question of relevancy. 

To the extent that the defendant's request limited evidence about her prior pregnancy to proof of its mere existence, the defendant successfully diminished the potential for prejudice harbored in the pregnancy's duration and in its termination.  This, quite naturally, also reduced the prior pregnancy's relevancy.  It is true that evidence of a prior pregnancy of unknown duration provided scant information to the jury.  However, relevant evidence is "'evidence having 
any
 tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'"  (Emphasis added.)  
Monroe
, 66 Ill. 2d at 322, 362 N.E.2d at 297, quoting Fed. R. Evid. 401.  Since a woman who has been pregnant before would be more likely to recognize a second pregnancy than a woman who was pregnant for the first time, the prior pregnancy made a claim central to the defense theory of the case less likely to exist.  Therefore, the prior pregnancy was relevant.

Finally, we do not believe that the jury ignored its charge to decide this case solely upon the evidence presented.  While the trial judge might have allowed the jury to hear of the abortion, no evidence of how the prior pregnancy terminated was permitted.  We are convinced that the guilty verdict did not stem from jury speculation over how the prior pregnancy ended.

The defendant received a fair trial.

For the reasons stated, we affirm.

Affirmed.

GOLDENHERSH, P.J., and HOPKINS, J., concur.