# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

*People v. Cooper*, 2013 IL App (1st) 113030

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CHRISTOPHER COOPER, Defendant-Appellant. |
| District & No. | First District, Second Division<br>Docket No. 1-11-3030 |
| Filed | June 4, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's convictions and sentences for predatory criminal sexual assault were upheld where his trial counsel was not ineffective in failing to investigate the effect of his neurological and cognitive impairments on his ability to waive his *Miranda* rights, in failing to raise a meaningful challenge to the voluntariness of his confession, or in failing to call certain witnesses; furthermore, defendant was not denied a fair trial by the court's admission of evidence that the complaining witness had an abortion or the State's inference that defendant had abused other adopted siblings, and although the trial court erred in giving a modified version of the pattern instruction on prior inconsistent statements, the error was harmless under the circumstances. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 08-CR-18227; the Hon. Joel L. Greenblatt, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on
Appeal

Arnstein & Lehr LLP, of Chicago (Ronald D. Menaker and Julie A. Meyer, of counsel), for appellant.

Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Tasha-Marie Kelly, and Koula A. Fournier, Assistant State's Attorneys, of counsel), for the People.

Panel

JUSTICE QUINN delivered the judgment of the court, with opinion.
Presiding Justice Harris and Justice Connors concurred in the judgment and opinion.

## OPINION

¶ 1    Following a jury trial, defendant Christopher Cooper was found guilty of four counts of criminal sexual assault and four counts of predatory criminal sexual assault. At sentencing, the court merged defendant's convictions and sentenced him to consecutive terms of 8 years' imprisonment on the four counts of predatory criminal sexual assault, for an aggregate term of 32 years' imprisonment. On appeal, defendant contends that: (1) trial counsel was ineffective for failing to investigate the extent of his neurological and cognitive impairments and their effect on his ability to knowingly and competently waive his *Miranda* rights; (2) trial counsel was ineffective for failing to present a meaningful pretrial challenge to the voluntariness of his confession; (3) trial counsel was ineffective for failing to call available witnesses; (4) he was denied a fair trial when the State was allowed to present evidence that the complaining witness was forced to undergo an abortion; (5) he was denied a fair trial when the State inferred to the jury that he sexually abused other adopted siblings; and (6) the trial court erred in giving a pattern jury instruction in its modified form. For the following reasons, we affirm.

¶ 2                                I. BACKGROUND

¶ 3    The record shows, in relevant part, that defendant was charged with four counts of predatory criminal sexual assault and four counts of criminal sexual assault in connection with his sexual abuse of R.C., his younger adopted sister, over the course of many years. Prior to trial, he filed a motion to suppress a statement he gave to police admitting the abuse on the grounds that it was involuntarily given. He alleged, *inter alia*, that his "will was overborne in that it is clear from the transcript that the Detectives clearly tried to create a position of trust by stating he knew [defendant's] father," and that "the Detectives appeared to coerce [him] into making a confession by stating he was a victim of circumstance." He further alleged that he "has an IQ of 79, is diagnosed with ADHD, had a traumatic brain

-2-

injury [at] birth, learning disability, as well as restricted reading and spelling abilities with low intellectual functioning."

¶ 4      At the hearing on defendant's motion, Rosemont police detective Jeff Caldwell testified that on August 21, 2008, he arrested defendant in Lombard for criminal sexual offenses. He then returned to the Rosemont police station and called the assistant State's Attorney (ASA). Prior to the ASA's arrival, an attorney appeared on defendant's behalf and was allowed to speak with him, and when he came out of the room, he said, "I don't want my client to talk to you guys." No one had attempted to speak with defendant beforehand, and no one attempted to speak with him thereafter.

¶ 5      Detective Caldwell next saw defendant on the afternoon of August 22. About 1 p.m., he removed defendant from his cell to bring him to a bond hearing. He first brought him into a booking room where Detective Richmond and Detective Muich were present, and the detectives instructed him to change into his street clothes and handcuffed him. At that point, defendant asked whether he would receive bond and how long he would have to remain in jail, and Detective Caldwell responded that he would not get bond and that he did not know how long he would remain in jail. Defendant then said, "I'm guilty. I did all those bad things to my sisters that were said that I did." Detective Caldwell told defendant "not to say anything else; that we had to do some paperwork, and we would be back to talk," and defendant told them that he wanted to speak to them "without his lawyer present."

¶ 6      That same afternoon, Detective Caldwell read defendant his *Miranda* rights and obtained his signature on a *Miranda* rights form. He then took defendant's statement in the presence of Detective Muich, who tape recorded it. During their conversation, Detective Caldwell told defendant that he would get him some help, but only after defendant said that he needed it. He did not tell defendant to "man up" before reading him his *Miranda* rights.

¶ 7      Rosemont detective Ronald Muich testified that on August 21, 2009, he accompanied Detective Caldwell, Detective Richmond, and Lieutenant Hasselberger to Lombard where defendant was taken into custody. Defendant and Lieutenant Hasselberger rode in his squad car back to Rosemont, and he did not have any conversation with defendant during the ride. When they arrived at the Rosemont police station, defendant was brought into a holding room, and Detective Muich stayed with him for about two hours and engaged in "[v]ery minimal conversation" with him. When asked what he discussed with defendant, Detective Muich testified that "it was just some small talk about his father, and he was telling me how much he missed his dad and really just about his dad." Detective Muich testified that he told defendant that he knew his father, and that "he was a real nice man, and, you know, I'm sorry that he passed away and that was pretty much it."

¶ 8      The following day, about 1 p.m., Detective Muich saw defendant again when he was taken out of his cell for a bond hearing and brought to a holding room where he, Detective Caldwell, and Detective Richmond were present. Defendant changed into his own clothes and was eventually handcuffed, and Detective Caldwell explained the bond hearing procedure to him. Although defendant mentioned his bond, nobody told him what it would be. Detective Muich did not recall defendant asking how long he would have to remain in jail. At some point, defendant, who was in handcuffs, turned to him and Detective Caldwell

and said, "I'm guilty. I did all these bad things to my sister–my sisters." Detective Caldwell then put up his hand and asked, "Christopher, are you reinitiating conversation with us," and defendant replied, "yes, I am."

¶ 9        Thereafter, Detective Caldwell read defendant his *Miranda* rights, and defendant was advised that his statement was going to be tape recorded, which he said was "fine." Detective Muich asked several times whether defendant was willing to reinitiate conversation without his attorney, and defendant responded, "yes, I am." After defendant was Mirandized, something about "help" came up, and the detectives said they "would talk to somebody in court. If he needed any kind of help, we would help him." When counsel asked Detective Muich whether he recalled having a conversation with defendant involving the statement "your father's looking down on you from heaven," Detective Muich testified that he "never brought up the word heaven." He also testified that he never used the phrase "man up."

¶ 10        Detective Muich testified that he knew defendant prior to arresting him. Defendant worked at Allstate Arena in maintenance, and whenever he saw Detective Muich, he would approach him and say "hi," and Detective Muich would say "hi" back. Detective Muich testified that he knew defendant's family as well, stating: "As an auxillary officer for Rosemont, I used to follow the school bus, and that's when I used to talk to Mr. [C.] a lot and he used to bring [defendant] and some of the other children to school so that's how I kind of knew the family."

¶ 11        The defense entered into evidence a copy of the *Miranda* waiver executed by defendant. The parties also stipulated that defendant has an intelligence quotient of 79. Counsel then argued that defendant's statement was not voluntary under the totality of the circumstances. Referring to his IQ, counsel noted that defendant "does not have such a low IQ where we are alleging any kind of mental retardation but it is the susceptibility that he had." He also noted that Detective Caldwell told defendant that he would not receive bond, that the Detectives specifically promised him that they were going to help him, and that it was "undignified being told to change in a holding area or booking room with people walking around." Ultimately, the court denied defendant's motion to suppress, finding, *inter alia*, that "[t]he waiver was knowingly and intelligently corroborated by his not only signing but initialing various phases of the written *Miranda* Warnings."

¶ 12        The State subsequently filed a motion to permit the use of other crimes evidence, citing defendant's sexual abuse of another sibling, but the memorandum of orders reflects that the motion was withdrawn. Thereafter, on the day of jury selection, the topic of defendant's other victims came up when the parties and the court discussed the editing of defendant's audiotaped statement. At that time, counsel indicated to the court that defendant's statement had been redacted, and the State clarified that the "confession that was taken isn't only in relation to this victim," and that "[a]ny reference to anyone else other than this victim, [R.C.], was redacted from the audiotape, as well as from the transcript." The court, at that point, noted, "I want to be very certain that there is not even a hint of any other alleged victim, not even–so it becomes important, and I'm sure [defense counsel] has listened to it very carefully, to begin that redaction prior to any intimation that there might be someone else."

¶ 13    That same day, counsel also made an oral motion *in limine* "to bar the State from asking questions about pregnancy or abortion, unless they are in a position to prove up those two purported facts," arguing that such testimony from the victim was hearsay. The State responded that it could prove those facts through the testimony of the victim, and the court noted that it "tend[ed] to agree with the State" and denied the motion.

¶ 14    At the ensuing jury trial, R.C. testified that she was born on November 11, 1990, and that she lived in Rosemont with her adoptive mother Patricia C. from the time she was a baby until she was 17 years of age, along with five adopted brothers and six adopted sisters. The house that she lived in was a "normal three-story house," and the boys slept in the basement, her adoptive father Hugh C. slept on the middle floor, and the girls slept upstairs.

¶ 15    R.C. testified to a pattern of sexual abuse by defendant, her adopted brother, who was eight years older. Beginning when she was about six years old, defendant would insert his fingers into her vagina on a weekly basis, either in the basement, in her room, or on the stairs going up to her room. She would cry when this happened, and defendant would put a pillow over her face and say, "Be quiet, be quiet." When she was eight or nine years old, defendant then began putting his mouth on her vagina once a week to twice a month. In subsequent years, when she was about 12 or 13 years old, defendant began making her perform oral sex on him and would also insert his penis in her vagina once or twice a month. About this time, R.C. started feeling sick; she "would throw up a lot during the day, and just felt different." She thought that she was pregnant and spoke with Patricia C. about it at her adopted sister Robin C.'s house in Lombard. Patricia C. confronted defendant, and defendant told Patricia C. that they only had sex once. After taking a pregnancy test, R.C. had an abortion in 2004 at the age of 13.

¶ 16    Shortly thereafter, detectives from the Rosemont police department came to R.C.'s school to speak with her. R.C. did not tell them the truth about who got her pregnant and told them it was a guy that she met on the street because that is what Patricia C. told her to say. In 2006, R.C. also met with Bonnie Fries for a private interview at a Children's Advocacy Center after investigators were told that something was going on in the house. She did not tell Fries what defendant had done to her because Patricia C. had told her that she "would go to a foster home and nobody wants teenagers," and she did not want to go to a shelter. Instead, she told Fries the same story that she had told the detectives, the one Patricia C. told her to tell, which was "[t]hat I met this guy that was, like, coming up on the side of the street, and then I felt lonely because my brother had just passed away, so I decided to have sex."

¶ 17    In late August 2008, police picked up R.C. from Robin C.'s house the day after she missed an interview at the Children's Advocacy Center. She was brought to the Rosemont police station and told Detective Caldwell everything that had happened with defendant because, in her words, "I was just, like, sick of being there and the abuse that was going on, and at the time I was 17, so I saw my sisters living on their own, and I figured I could do it myself." R.C. also had another interview with Fries at the Children's Advocacy Center and told her what defendant had done to her because she "didn't want to lie anymore." After her conversation with Detective Caldwell, R.C. never lived with Patricia C. or defendant again.

¶ 18    On cross-examination, R.C. stated that she came forward with her story of sexual abuse

because she was sick of being at the house with defendant. She wanted to tell police about the abuse in 2004, but was threatened by Patricia C. that they would beat her, or that she would be placed in a shelter. R.C. stated that she was scared of Patricia C., Robin C., and defendant. She also could not confide in Ronald C., Patricia C.'s biological son who was a police officer, because he was related to Patricia C. and she did not trust him.

¶ 19    R.C. was confronted with a letter she had written to her friend Katelyn in 2004 about the circumstances of her pregnancy, which stated:

"I was with my best friends, and we were walking in the woods, and my friends left to go get something, and all of a sudden my boyfriend comes with a guy that I've never seen, and the guy has a camera, and my boyfriend has never taken drugs and all of that, but this time he got high off of something and started punching me and slapping me, and I was so scared I didn't know what to do. And after that, he punched me really hard, and I got knocked out. And he raped me. I woke up the last minute of it when my friends came back and threw him off me."

R.C. acknowledged writing this letter, but stated that it was "not truthful at all."

¶ 20    R.C. stated that when she was interviewed by Fries in 2006, they were alone and she did not feel threatened. However, she stated that she did not feel that she could be truthful with Fries because she knew that if "Pat [C.] would find out, [she would] be in trouble, so [she] kept it a lie." R.C. also acknowledged that when she spoke with Fries on September 2, 2008, she did not mention that defendant had put his penis in her mouth, or that defendant had performed oral sex on her.

¶ 21    R.C. further acknowledged an e-mail that she sent to Robin C. on the morning of August 27, 2008. The e-mail stated, *inter alia*, that "I didn't mean to tell on Chris. None of it was the truth." It also stated, "I told them that I got pregnant by somebody. His name is Jeff. I don't know his last name, but I knew him for a while, and he moved to another state a long time ago, like four years ago." She explained in the e-mail that "[t]he police told me to tell them what they wanted to hear."

¶ 22    R.C. stated that when defendant had sexual intercourse with her on the staircase the noise was loud, but that her father "was on an oxygen tank that was so loud, so it's pretty hard to hear over that, and he would sleep with the TV on." R.C. trusted her father, but she never told him about the sexual abuse because she thought that she would get in trouble.

¶ 23    On redirect, R.C. testified that it is embarrassing to talk about what defendant did to her. She also testified that she told Fries the truth in September 2008, just not the whole truth, and that she told the truth to Detective Caldwell in 2008. She further testified that she wrote the letter to her friend Katelyn "[b]ecause my friends would look at me, like, weird, like, 'Oh, your brother touched you,' so I made up a lie so they wouldn't, like, look at me gross or disgusting."

¶ 24    R.C. testified that she was scared of Robin C. because "[s]he would beat us when we would get in trouble for, like, the smallest little things and, like, threaten us, threaten to kill us at numerous times." She also testified that what she wrote in the e-mail to Robin C. was not true, and that she wrote it because, "I had just gotten off the phone with her, and I was staying at a shelter, and it was, like–I didn't like it at all, and I just wanted to go home, like,

where I grew up my whole life, even if it was bad."

¶ 25    Detective Muich testified that on August 21, 2008, Detective Caldwell received a report from Department of Children and Family Services (DCFS). Based on that report, Detective Muich, Lieutenant Hasselberger, Detective Caldwell, and Detective Richmond went to 6119 Hawthorne Street, in Rosemont, to take R.C., Melissa C., and Michael C. into protective DCFS custody. When no one was home, they went to Robin C.'s house at 327 Stewart Avenue, in Lombard, and found defendant and the children.

¶ 26    Detective Caldwell testified that on August 21, 2008, he was assigned by DCFS to take temporary custody of Melissa C., Michael C., and R.C. He went to 6119 Hawthorne Street, where the family resided, but no one was home. He then went to Robin C.'s house and found Patricia C., defendant, R.C., Michael C., and Melissa C. Detective Caldwell testified that he brought the children to the Rosemont police station, and that defendant was taken into custody and brought there by Detective Muich and Lieutenant Hasselberger. Detective Caldwell spoke with R.C. at the station for a few hours after which she was brought to a DCFS shelter. He did not speak with defendant that evening.

¶ 27    About 1 p.m. on August 22, 2008, Detective Caldwell was preparing defendant for a bond hearing when defendant stated that "he was guilty and that he did all the bad things that were said that he did to his sister." Detective Caldwell told him, "Well, hold on a second. Don't say anything else." He then removed defendant's handcuffs and asked him, "Are you saying you want to talk to us," and defendant responded, "Yes." The detective asked, "Without your attorney," and defendant said, "Yes, I want to talk to you." Detective Caldwell told defendant to wait, then moved him to an interview room, advised him of his rights from a *Miranda* waiver form, and had him initial those rights and sign the form.

¶ 28    Detective Caldwell then had a taped conversation with defendant. Defendant told him that when he was 16 or 17 years old, he began having sexual relations with R.C., who was then 8 years old. He initially would penetrate her vagina with one or two fingers about once a month, and throughout the conversation, defendant stated that "he licked her pussy and that he enjoyed doing that." When R.C. was about 13 years old and in eighth grade, he had intercourse with her which resulted in pregnancy. He stated that "[h]e knew that he was the father, and he said he did not want to be the father and Patricia was mad at him, and Patricia and Robin took [R.C.] to an abortion clinic to have the baby aborted." Defendant explained that he would ejaculate in the toilet or in the sink after sex, but not in her or on her other than that one time. He also told Detective Caldwell that "he wished that he had told the truth on the night that he was picked up, and he wished that he had told Detective Muich when he had the opportunity, and he's sorry that it went on for so long." Detective Caldwell learned that defendant's birthday is March 11, 1982. The State rested. Defendant's motion for a directed verdict was denied.

¶ 29    For the defense, Detective Muich testified that about 1 p.m. on August 22, 2008, he was downstairs at the Rosemont police station getting defendant ready for a bond hearing. Defendant had previously been informed of the charges against him by the officers who processed him in the middle of the night, and Detective Caldwell informed him of the charges again, though Detective Muich does not remember exactly what was said. Detective

Muich testified that "there was [also] some conversation about how he was going to be turned over to the sheriffs, he was going to appear before a judge, and then he would just be in the hands of the court and that would be it." About 1:20 p.m., however, defendant said, "I'm guilty. I did those things to my sister."

¶ 30    Detective Muich testified that between 1 p.m. and 1:20 p.m., he does not recall defendant being told that "once he gets to the county that there was no telling what would happen to him," or that the judge would not be giving him bond. He also testified that nothing was said "about the Cook County jail being full of blacks and Hispanics," and that neither he, Detective Caldwell, nor Detective Richmond told defendant that "this was [his] last chance to help himself." Further, he testified that no one told defendant that they already knew "all the bad things" he had done to his sister, that if he "simply helped himself by telling [them] that he did these bad things to his sister *** [they] would not have to take him to see the judge," or that "now is the time to help yourself."

¶ 31    Detective Muich was present when defendant's statement was recorded. He denied using the phrase "man up" to defendant at the time, testifying, "I never use the word man up. Never." He also acknowledged that on the second part of the tape, for a very short part of the interview, the statements were inaudible.

¶ 32    Bonnie Fries testified that she is a licensed clinical social worker at the Children's Advocacy Center of North and Northwest Cook County. On November 21, 2006, she conducted a victim sensitive interview (VSI) of 16-year-old R.C. They were alone in the room so R.C. would be comfortable, and two detectives from the Rosemont police department and a DCFS investigator observed the interview through a one-way mirror. Fries testified that the goal of a forensic interview is to "obtain facts from the child by asking non-leading and non-suggestive questions," and that at the start of an interview, she goes over the rules, including the importance of telling the truth.

¶ 33    Fries interviewed R.C. again on September 2, 2008, following the same protocol. They were alone this time as well, and a DCFS representative was behind the one-way mirror. R.C. appeared older than the previous time, but not disheveled. Regarding her demeanor, Fries testified that "[s]he seemed to come in having an understanding of why she was there, ready to talk openly to me. She didn't–she wasn't crying or overly upset in the interview. She spoke to me very matter-of-factly and did just fine."

¶ 34    Ronald C. testified that he is defendant's eldest brother and the biological son of Patricia C. He lives in Chicago and is employed by the Chicago police department as a school liaison and crisis intervention officer. From 2000 to 2008, Ronald C. had contact with his family once every four or five weeks for holidays, birthdays, and dinners at his sister's house. He usually had contact with defendant and R.C. during family parties at his sister's house when he would go down in the basement with the kids and play games and watch movies. Ronald C. testified that none of the children ever told him that they were being abused.

¶ 35    Defendant testified that Patricia C. and Hugh C. are his adoptive parents. With respect to his education, defendant testified that in grammar school and high school, he was in a special education program, and that he eventually graduated with his associate's degree from Triton College, where he had "specialized privileges."

¶ 36    About 6:21 p.m. on August 21, 2008, defendant was at Robin C.'s house when Rosemont detectives arrived. He was handcuffed behind his back, placed into the back of a squad car, and driven by Detective Muich to the Rosemont police station. During the ride, Detective Muich asked him at least four times whether he knew what had happened with R.C., and each time he replied, "I do not know what's going on." Detective Muich also asked him "what was going on at the Allstate Arena and that was pretty much it."

¶ 37    At the station, Detective Muich and Lieutenant Hasselberger removed defendant from the car and brought him into a "holding slash booking room." Detective Muich sat with him there and continued to ask him questions about R.C., specifically, whether he knew what had happened to her. He remained in that room for about two and a half hours and was visited by an attorney during that time. The attorney told him that he was his counsel and instructed him, "Do not talk to the detectives." He then left, and Detective Muich came back into the room and began talking about his dad, "saying that he knew my dad and that was pretty much it." He told defendant that his father "was a great wonderful man and he's going to be well missed." Defendant testified that Detective Muich was not a friend of his father, that he never saw him at his parent's house, and that Detective Muich never expressed sympathy about the loss of his father when he saw him at the Allstate Arena. About an hour and a half after defendant's attorney left, Detective Muich took defendant to a holding cell. The room was about 55 degrees, and he asked Detective Muich for an extra blanket which he received. That night, Detective Muich came down to check on him about five times. Defendant testified that during these checks, Detective Muich made only small talk and did not ask defendant about his case.

¶ 38    About 8 a.m. on August 22, 2008, defendant was removed from his cell by a patrol officer and taken to the "holding slash booking room." Detective Muich came by and started talking to him about his father, "saying he's a wonderful man and I've known him for many years. I used to know him over at the grammar school." Defendant was expecting to go to bond court that morning, but after his conversation with Detective Muich, he was returned to his cell.

¶ 39    About 1 p.m., Detective Muich and Detective Caldwell brought defendant from his holding cell to the "holding slash booking room" again and told him that he was going to bond court that afternoon. Defendant asked them if he would be getting bond and what was going to happen at bond court, and Detective Muich responded that he was not going to be getting a bond and "was going to go down to Cook County jail and become someone's bitch." Defendant took that to mean that he would be raped. Detective Muich also told him that "there's a whole bunch of blacks, Mexican, and Hispanics down there," and that "since I'm a small guy, you know, I'm not going to fit in real well. They are going to end–I will end up being someone's bitch." He then told defendant that he needed "to man up to what happened with [R.C.]," and defendant responded, "man up to what." Detective Muich said, "just man up, tell us what we want to hear and we can get you the help that you need." Defendant did not reply and sat there for about 20 minutes while the detectives were handling paperwork.

¶ 40    Defendant acknowledged that he subsequently gave an audiotaped statement, but testified that he gave the statement because "[t]hey were telling me what to say. They kept on

pressuring me, telling me to man up. You know you did this to [R.C.] Man up. We can get you the help that you need." He testified that prior to giving his statement, Detective Caldwell told him the questions that would be asked and the answers he was to give. Defendant gave these answers on the tape and, later, to the ASA. He also testified that he believed the officers were going to get him help, that he was scared, that he was telling them anything that they wanted to hear, and that he did not commit any of the acts of which he is accused.

¶ 41    Dr. Veronika Kroin, a pediatrician, testified that she first examined defendant when he was 10 years old. It was her opinion that defendant was developmentally delayed and had a learning disability as a result of being born premature and sustaining a brain injury caused by lack of oxygen to his brain. Dr. Kroin sometimes prescribed defendant medication for attention deficit hyperactivity disorder, and she had referred him to a pediatric endocrinologist and a pediatric neurologist. She last examined his mental condition in 1997, at which time defendant was still in special education because of his learning disability. Dr. Kroin testified that neither a brain injury nor a learning disability ever goes away, and that she thinks defendant still has a brain injury. Dr. Kroin also treated R.C. since she was born and testified to numerous examinations of her, none of which indicated anything abnormal with her genitalia.

¶ 42    In rebuttal, Detective Caldwell testified that before defendant gave his confession, he did not tell defendant the questions he was going to ask him, or the answers that he wanted him to give. He testified that the words in the audiotaped confession belonged to defendant, that defendant never asked him to speak with his attorney while he was at the Rosemont police station, and that he never told defendant that he would let him go home if he admitted to sexually assaulting his sister.

¶ 43    During the jury instruction conference, defense counsel offered two versions of Illinois Pattern Jury Instructions, Criminal, No. 3.11 (4th ed. 2000) (hereinafter IPI Criminal 4th No. 3.11) which were both objected to by the State. The court ultimately allowed IPI Criminal 4th No. 3.11 in its modified form, with the second paragraph stricken.

¶ 44    In closing argument, the State made the following remarks:

"What other types of penetration did this defendant commit on [R.C.]? [R.C.] told you that he put his penis into her vagina. When I asked–or when [R.C.] was asked, 'When did that start,' she said, 'When I was 12. About a year before I had to have the abortion.'"

Defense counsel then argued:

"[I]f I wanted to tell you that I was a woman, I had an abortion, is that statement in and of itself sufficient to have you believe yes, an abortion was had by [defense counsel] in 2004? No. You, as the judges of the facts in this case, must demand proof of those statements, those allegations. So you bring in the woman or the man, the Doctor who examined me, who says yes, I was pregnant; yes, I gave this man or this woman, whoever it was at the time, an abortion. That would be facts, that would be evidence to be able to have you say that."

In rebuttal, the State responded:

-10-

"[R.C.] goes to a center to have a procedure. She believed she was going to that center to have an abortion. And she told you that 9 months later, she never gave birth to a kid. Really? Really? Do you have to have a doctor come in here and say, 'Oh, yes, I performed an abortion.' A woman wouldn't know what's happening to her body? Anybody wouldn't know what's happening with their body? That's ridiculous, absolutely ridiculous."

Following deliberations, the jury returned verdicts finding defendant guilty of all counts.

¶ 45    Defendant, represented by new counsel, defendant's lawyer on appeal, subsequently filed a motion for a new trial alleging, *inter alia*, that trial counsel was ineffective for failing to investigate and present evidence at the motion to suppress hearing that he was unable to competently and knowingly waive his *Miranda* rights due to "Neuro-Cognitive Deficiencies and Mentally Retarded Intellectual Functioning." He attached to the motion a psychiatric evaluation report by Dr. Albert Stipes and a psychological evaluation report by Michael Rabin Ph. D., a licensed clinical and forensic psychologist.

¶ 46    Interestingly, Dr. Rabin's 32-page report indicates that defendant told Dr. Rabin that Detective Muich came into his cell the night he was in custody on six occasions. On these occasions, Detective Muich told defendant that his father would want him to confess and that defendant's sisters said that defendant had molested them since they were little. Defendant said that he told Detective Muich that he wanted to talk to his attorney. Defendant also told Dr. Rabin that the next morning, the police told him that they had arrested his mother and his sister. Defendant did not testify to any of this during the trial. Dr. Rabin administered a test called the "Grisso Instrument for the Assessing Understanding and Appreciation of Miranda Rights." Defendant scored a total of 24 points which is slightly higher than the adult norm, which is 23 points. In spite of this, Dr. Rabin opined that "he is unable to adequately appreciate the function or application of his constitutional right to silence and to appreciate the consequences of giving up his rights."

¶ 47    Dr. Stipes' report indicates that defendant was on the Honor Roll in high school and college, but that he received assistance in doing so. Defendant also told Dr. Stipes that the police told him on five occasions that they knew he had sex with [R.C.] and Samantha and if he said he did it, they would let defendant go home. When Dr. Stipes asked defendant what he understood regarding *Miranda*, defendant replied, "Remain silent and have an attorney." "Silent" means "Do not talk." He asked, if you tell the police something, what happens? "Whatever you say can be used against you. *** Used negatively, what you say." Defendant also said he knew he could have an attorney present during questioning and that he would be appointed an attorney if he could not afford one. Dr. Stipes noted, "On the Miranda test (Grisso), He was able to state the rights and even explain them, but if asked about them in a different way, he became confused." In spite of this, Dr. Stipes opined, "As the testing has shown, he lacked the ability to adequately understand his rights in the custody situation and was easily intimidated by the police as authority figures. I do not believe he had the ability to understand and waive his rights in that situation."

¶ 48    Defendant also filed a supplemental motion for a new trial alleging that trial counsel was ineffective for failing to call multiple witnesses that he was aware of who could have directly

contradicted R.C.'s version of the events. Attached to this motion were affidavits from Jim Horvath, Robin C., and Ronald C., as well as a statement from Dr. Tamar Perlow.

¶ 49 After a hearing, the trial court denied defendant's motion for a new trial. The court found, *inter alia*, that introduction of the reports finding that defendant was unable to competently and knowingly waive his *Miranda* rights would not have created a reasonable probability that the court would have granted defendant's motion to suppress. The court noted that "[e]vidence of a defendant's limited intellectual capacity by itself does not indicate that a defendant is incapable of waiving his or her constitutional rights knowingly and thereafter making an inculpatory statement," and that it is "only one factor that's to be considered in the totality of the circumstances." The court further noted that it was "not obligated to accept the psychologist's conclusions." The court also found that trial counsel was not ineffective for failing to call the proposed witnesses because "decisions on witnesses ultimately rests [*sic*] with trial counsel."

¶ 50                                        II. ANALYSIS

¶ 51                         A. Ineffective Assistance of Trial Counsel

¶ 52 In this appeal, defendant initially maintains that he was denied the effective assistance of trial counsel where counsel: (1) failed to investigate the extent of his neurological and cognitive impairments; (2) failed to present a meaningful pretrial challenge to the voluntariness of his confession; and (3) failed to call certain available witnesses.

¶ 53 To establish a claim of ineffective assistance of counsel, defendant must first show that counsel's performance was deficient, *i.e.*, it fell below an objective standard of reasonableness. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687. Secondly, defendant must show that counsel's deficient performance resulted in prejudice to the defense, *i.e.*, a reasonable probability that, but for counsel's deficient performance, the result of the proceedings would have been different. *Strickland*, 466 U.S. at 687, 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. Both prongs of *Strickland* must be satisfied to succeed on a claim of ineffective assistance of counsel. *People v. Flores*, 153 Ill. 2d 264, 283 (1992).

¶ 54                   1. Failure to Investigate Neurological and Cognitive Impairments

¶ 55 Defendant first claims that trial counsel was ineffective for failing to investigate the extent of his neurological and cognitive impairments, and to obtain a forensic expert to determine the impact of those impairments with respect to his *Miranda* rights. He argues that trial counsel was provided with a number of records and reports, including academic records, medical records, and psychological evaluations, but that counsel made no effort to investigate whether the neurological and cognitive dysfunction detailed therein deprived him of the ability to knowingly and competently waive his *Miranda* rights. He further argues that in light of the opinions of Dr. Albert Stipes and Michael Rabin, there is a reasonable probability that if counsel had investigated the significance of the evidence he possessed, and retained

a forensic expert to analyze it, the motion to suppress his statements would have been granted.

¶ 56    The State responds that defendant has not provided evidence to support his claim that counsel failed to investigate his inability to knowingly waive his *Miranda* rights. In reply, defendant claims that "the absence of such evidence does not preclude this court from drawing whatever inferences are warranted from the record."

¶ 57    "Attorneys have an obligation to explore all readily available sources of evidence that might benefit their clients." *People v. Makiel*, 358 Ill. App. 3d 102, 107 (2005). An attorney who fails to conduct a reasonable investigation and interview witnesses cannot be found to have made decisions based on valid trial strategy. *Makiel*, 358 Ill. App. 3d at 107. "Whether defense counsel was ineffective for failure to investigate is determined by the value of the evidence that was not presented at trial and the closeness of the evidence that was presented." *Makiel*, 358 Ill. App. 3d at 107.

¶ 58    Here, defendant has not cited any evidence to support his claim that counsel was ineffective for failing to investigate his neurological and cognitive impairments. We also decline his request to infer counsel's failure to investigate from the following: (1) that the State's response to his motion for a new trial did not raise "the possibility that trial counsel could have conducted proper investigation but for strategic reasons chose not to pursue that avenue"; (2) that trial counsel would not have included a reference to defendant's neurological and cognitive deficits in the motion to suppress if a forensic expert had concluded that nothing contained in his records impacted his ability to waive *Miranda* and make a voluntary statement; (3) that if a forensic expert had concluded that defendant's deficits impacted his ability to waive *Miranda* or make a voluntary statement, counsel would have presented that evidence at the hearing; and (4) that the record contains no court order allowing a forensic expert access to the jail to interview him. The supreme court has stated that "defendant cannot rely on speculation or conjecture to justify his claim of incompetent representation." (Internal quotation marks omitted.) *People v. Clarke*, 391 Ill. App. 3d 596, 614 (2009) (quoting *People v. Deleon*, 227 Ill. 2d 322, 337 (2008)). This is precisely what defendant relies on here; thus, we find that defendant cannot establish that counsel's performance was deficient. *Strickland*, 466 U.S. at 687.

¶ 59    Defendant's reliance on *People v. Kluppelberg*, 257 Ill. App. 3d 516 (1993), *People v. Kelley*, 304 Ill. App. 3d 628 (1999), and *People v. Montgomery*, 327 Ill. App. 3d 180 (2001), is misplaced. In *Kelley* and *Kluppelberg*, defendants requested this court to infer that counsel failed to investigate witnesses who did not testify, and this court stated that it could draw no such inference from the record. *Kelley*, 304 Ill. App. 3d at 635; *Kluppelberg*, 257 Ill. App. 3d at 527. In *Montgomery*, 327 Ill. App. 3d at 186, this court found that summary dismissal of defendant's postconviction petition was not warranted where the allegations regarding trial counsel's failure to investigate were not positively rebutted by the record.

¶ 60    Contrary to defendant's claim, *Kelley* and *Kluppelberg* do not provide this court authority to infer from the record whether trial counsel conducted proper investigation. In fact, the result reached in those cases is completely at odds with what defendant is requesting, as this court specifically stated that it could not draw the proposed inference from the record.

*Montgomery* also does not apply because that was an initial review postconviction case where defendant needed only to state the "gist" of a constitutional claim for his petition to advance for further proceedings. See *People v. Delton*, 227 Ill. 2d 247, 253-54 (2008). We thus find no merit to this claim.

¶ 61                   2. Failure to Meaningfully Challenge the Voluntariness
                              of Defendant's Confession

¶ 62    Defendant next claims that counsel failed to present a meaningful pretrial challenge to the voluntariness of his confession. He argues that his medical, social, and psychological history should have alerted counsel to the possibility that his statement was not voluntarily given, but that counsel did not present this evidence at the motion to suppress hearing, thereby "foreclosing any meaningful challenge to the voluntary nature of the defendant's confession." The State responds that trial counsel made a decision to argue that defendant was coerced into making his statement by the officers, as opposed to focusing on his intellectual challenges, and that this was a matter of trial strategy, which cannot support a claim of ineffective assistance of counsel.

¶ 63    It is well settled that "[d]ecisions concerning which witnesses to call at trial and what evidence to present on defendant's behalf ultimately rest with trial counsel." *People v. West*, 187 Ill. 2d 418, 432 (1999). These types of decisions are matters of trial strategy, which are generally immune from claims of ineffective assistance of counsel. *West*, 187 Ill. 2d at 432. "This general rule is predicated upon [the] recognition that the right to effective assistance of counsel refers to 'competent, not perfect representation.' " *West*, 187 Ill. 2d at 432 (quoting *People v. Stewart*, 104 Ill. 2d 463, 492 (1984)). "Hence, '[m]istakes in trial strategy or tactics or in judgment do not of themselves render the representation incompetent.' " (Internal quotation marks omitted.) *West*, 187 Ill. 2d at 432 (quoting *People v. Hillenbrand*, 121 Ill. 2d 537, 548 (1988)). "The only exception to this rule is when counsel's chosen trial strategy is so unsound that 'counsel entirely fails to conduct any meaningful adversarial testing.' " *West*, 187 Ill. 2d at 432-33 (quoting *People v. Guest*, 166 Ill. 2d 381, 394 (1995)).

¶ 64    Here, the record shows that counsel filed a motion to suppress asserting that defendant's statement was involuntarily given and coerced, and that defendant "has an IQ of 79, is diagnosed with ADHD, had a traumatic brain injury [at] birth, learning disability, as well as restricted reading and spelling abilities with low intellectual functioning." At the hearing on the motion, counsel presented testimony from Detectives Caldwell and Muich regarding the circumstances of the confession. He elicited, *inter alia*, that Detective Muich, who knew defendant and his family, had spoken with defendant about his father in the holding room on the day of his arrest; that Detective Caldwell had told defendant just prior to his statement that he would not get bond and that he did not know how long he would remain in jail; and that after defendant was Mirandized, the detectives had offered to "help" him. Counsel further stipulated that defendant has an intelligence quotient of 79. He then argued that defendant's statement was not voluntary under the totality of the circumstances.

¶ 65    The record clearly shows that counsel's strategy for the motion to suppress was to attack the voluntariness of defendant's confession based on the circumstances under which it was

given, rather than based on defendant's mental deficiencies. This strategy was certainly reasonable considering that defendant graduated with an associate's degree from Triton College and was later able to testify articulately at trial. Although ultimately unsuccessful, we cannot say that the chosen strategy was so unsound that it could be said that counsel entirely failed to conduct any meaningful adversarial testing. *West*, 187 Ill. 2d at 432-33.

¶ 66 Furthermore, we find that defendant cannot establish that he was prejudiced by counsel's failure to focus on his mental deficiencies. In determining whether a confession was voluntary, the totality of the circumstances should be considered, including: defendant's age, education, background, experience, mental capacity, and intelligence; his physical condition at the time of questioning; the duration of detention and questioning; whether he was advised of his *Miranda* rights; and whether he was subjected to physical or mental abuse. *People v. Mitchell*, 366 Ill. App. 3d 1044, 1049 (2006) (citing *People v. Ballard*, 206 Ill. 2d 151, 177 (2002)). "Evidence of defendant's mental deficiency alone does not render a statement involuntary." *People v. Walker*, 2012 IL App (1st) 083655, ¶ 40 (citing *In re W.C.*, 167 Ill. 2d 307, 328 (1995)). "Whether a waiver is knowing and intelligent is determined by the particular facts and circumstances of the case, 'including the background, experience, and conduct of the accused.' " *People v. Braggs*, 209 Ill. 2d 492, 515 (2003) (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)).

¶ 67 Having reviewed defendant's tape-recorded statement and the evidence presented at the hearing on the motion to suppress defendant's confession, we note that there was literally no evidence presented that would support a finding that defendant's will was overborne. We also note that defendant's testimony at trial did not support a finding that he did not understand the *Miranda* warnings, or that his will was overborne, and that Dr Stipes' and Dr. Rabin's evaluations likewise do not support a finding that defendant did not understand his *Miranda* rights. Indeed, defendant accurately explained these rights to both Dr. Stipes and Dr. Rabin. It is possible that the doctors' findings were colored because defendant told them that the police had badgered him throughout the night, a fact he denied in his trial testimony.

¶ 68 The trial court's finding that defendant gave a voluntary statement thus would not have been affected by counsel's presentation of defendant's medical, social, and psychological history. Although the record shows, *inter alia*, that defendant had a low IQ and suffered from a learning disability, defendant was nonetheless able to obtain his associate's degree from Triton College, as well as coherently answer all of the questions posed to him at trial. He was also intelligent enough to understand and follow his attorney's advice on the day of his arrest to not speak with the detectives, seeing as he only admitted his guilt the following day when he was about to be taken to a bond hearing, at which time he told the detectives that he wanted to speak to them "without his lawyer present." Under the circumstances, we cannot say there exists a reasonable probability that defendant's motion to suppress would have been granted had counsel presented evidence of his medical, social, and psychological history. *Strickland*, 466 U.S. at 687, 694.

¶ 69 Defendant's reliance on *People v. Perez*, 148 Ill. 2d 168, 187, 196 (1992), is unavailing. In *Perez*, 148 Ill. 2d at 187, 196, the supreme court vacated defendant's capital sentence and remanded for a new sentencing hearing after finding, *inter alia*, that trial counsel failed to present important mitigating evidence in his possession to the sentencing jury. The supreme

court found that trial counsel's failure to present the evidence "was not the product of a thorough investigation, but rather of ignorance of the information, and thus not a strategic decision." *Perez*, 148 Ill. 2d at 187. Here, unlike *Perez*, there is no indication that counsel was ignorant of defendant's mental health history; to the contrary, counsel specifically referred to his mental health history in the motion to suppress. His actions are thus reflective of a strategic decision, and we find no merit to defendant's claim to the contrary.

¶ 70                                           3. Failure to Call Witnesses

¶ 71       Defendant also claims that trial counsel was ineffective for failing to call certain available witnesses whose testimony would have advanced his theory of defense and substantially impeached R.C., namely, Jim Horvath, Robin C., Ronald C., and Dr. Tamar Perlow. The State responds that counsel's decision not to call these witnesses was a matter of trial strategy and cannot support a claim of ineffective assistance because the witnesses' testimony would have added nothing to defendant's theory of the case.

¶ 72       As previously noted, decisions concerning which witnesses to call on defendant's behalf are matters of trial strategy reserved to the discretion of trial counsel. *People v. Enis*, 194 Ill. 2d 361, 378 (2000). Such decisions are entitled to a strong presumption that they reflect sound trial strategy, and are thus generally immune from ineffective assistance of counsel claims. *Enis*, 194 Ill. 2d at 378. The exception is where counsel's strategy was so unsound that no meaningful adversarial testing was conducted. *Enis*, 194 Ill. 2d at 378.

¶ 73       Here, defendant alleged in his motion for a new trial that trial counsel was ineffective for failing to call Jim Horvath, Robin C., Ronald C., and Dr. Tamar Perlow. He provided affidavits from the first three proposed witnesses, and an unsigned statement and electronically signed letter from Dr. Perlow, wherein each indicated that trial counsel knew of the information that each could provide.

¶ 74       Jim Horvath averred that he and Robin C., his wife, lived at Patricia C.'s home in Rosemont from about September 1997 to December 1999, and shared a room and bunk bed in the basement with defendant. Defendant slept in the twin bed on top, and Horvath and Robin C. shared a full-sized bed on the bottom. To get in or out of bed, defendant would have to step on their bed or use a ladder, and the metal frame of the bed would shake whenever the ladder was used. Horvath and Robin C. also had two dogs that slept in the room with them, and they would generally bark if anyone entered or exited the basement while they were in bed. Horvath averred that he has "no recollection of the dogs ever waking [him] during the night by barking," that he was never woken by activity in defendant's bed, that he never heard anyone crying in the room, and that he never observed R.C. in the basement once everyone was in bed. Further, there were two old wooden staircases in the house that "creaked loudly when used," one going from the first floor to the basement, and the other, directly over the basement, going from the first floor to the second floor. Horvath averred that one can hear someone walking up or down those stairs from the basement, and that he cannot recall ever being woken during the night by someone using those stairs.

¶ 75       Robin C. adopted Horvath's affidavit and averred that she never physically assaulted R.C. In summer 2004, she and Patricia C. accompanied R.C. when she went to speak with

a counselor regarding the termination of her pregnancy. While waiting to see the counselor, Patricia C. told R.C. that "rather than terminate the pregnancy 'she could keep the baby, and we could raise it just like one of our own.'" R.C. responded that "she did not want to be pregnant, she was too young, and 'just wanted it to be over with.'"

¶ 76    Ronald C. averred that sometime around September 2004, Patricia C. called him and asked him to come over to speak with R.C. due to concerns about her behavior. When he arrived, he asked R.C. why Patricia C. wanted him to speak with her, and she told him that "she had been depressed about her brother Kevin dying, and one night snuck out of the house and met a boy at the Park District." She calmly told him that "she had sex with the boy, ended up pregnant, and decided to get an abortion." R.C. mentioned the boy's name, but Ronald C. does not remember it. He would not have forgotten if it had been defendant's name. R.C. told him that "she had learned her lesson from this behavior, realized she had made a mistake, and told [him] that [they] did not have to worry about her doing anything like this again." Ronald C. did not discuss this conversation with anyone since he had been asked to speak with R.C. privately, but he told Patricia C. that he "felt comfortable with the fact that [R.C.] had learned a valuable lesson, and [he] did not believe she had anything further to worry about in this regard."

¶ 77    Dr. Tamar Perlow stated in her electronically signed letter:

"[R.C.] was seen on 7/16/04 with her mother one month after she reported she had had a sexual encounter with a 'total stranger.' At that visit, [R.C.] reported that the encounter was consensual with a caucasian male who was approximately 19 years old. She was seen again on 8/23/04 and 8/26/04, and at none of these three visits, in any way, was any mention of molestation, nor forced sexual encounter made."

¶ 78    Here, defendant cannot rebut the presumption that counsel's decision not to present the proposed testimony of Horvath, Robin C., and Ronald C. constituted sound trial strategy. The general theme of this case was that R.C., an adopted child, had been repeatedly sexually assaulted by her older brother for a number of years while the adoptive family either failed to recognize the abuse or participated in covering it up. Calling family members to challenge the credibility of R.C. under these circumstances clearly presented a tremendous risk to the defense that the family would appear unconcerned with the abuse that she had suffered or appear as if they were attacking her, thereby bolstering her credibility or giving the jury reason to sympathize with her. There is evidence that the family would have come off this way where R.C. testified on cross-examination that she was scared of Robin C., and that she could not confide in Ronald C. because he was related to Patricia C. and she did not trust him. Counsel appears to have recognized this risk since he decided to offer only innocuous testimony from Ronald C., who as a school liaison and crisis intervention officer with the Chicago police department might have been viewed more favorably by the jury. Otherwise, however, counsel presented a vigorous defense on defendant's behalf, including a lengthy, blistering cross-examination of R.C., and testimony from multiple witnesses aimed at challenging R.C.'s claims of abuse and the voluntariness of defendant's statement. Under the circumstances, we find that counsel's decision not to present the proposed testimony of Horvath, Robin C., and Ronald C. was a matter of trial strategy, and thus immune from defendant's ineffective assistance of counsel claim. *Enis*, 194 Ill. 2d at 378.

-17-

¶ 79 We similarly find that defendant cannot establish that he was prejudiced by counsel's failure to present Dr. Perlow's proposed testimony, which was merely cumulative of an uncontested issue, *i.e.*, that R.C. failed to initially identify defendant as her abuser. Given that R.C. readily admitted this failure during her testimony, we find the proposed testimony of Dr. Perlow is of little value and certainly not enough to demonstrate a reasonable probability that defendant would have been acquitted. *Strickland*, 466 U.S. at 687, 694.

¶ 80 The cases relied on by defendant are distinguishable. In *People v. Tate*, 305 Ill. App. 3d 607, 610 (1999), defendant filed a postconviction petition alleging that trial counsel was ineffective for failing to call three alibi witnesses. On appeal, this court found that defendant was entitled to an evidentiary hearing because the affidavits of those witnesses supported defendant's theory that he was misidentified and there was "no apparent strategic reason for not calling them to testify." *Tate*, 305 Ill. App. 3d at 612. The court explained that "[o]nce evidence is heard on the issue, the circuit court will be in a better position to determine whether defendant received ineffective assistance of counsel." *Tate*, 305 Ill. App. 3d at 612.

¶ 81 In *People v. O'Banner*, 215 Ill. App. 3d 778, 787 (1991), defendant was found guilty of murder and filed a motion for a new trial alleging ineffective assistance of trial counsel. At the hearing on that motion, defendant's son testified that he had told trial counsel that he shot the victim and would testify on defendant's behalf. *O'Banner*, 215 Ill. App. 3d at 788. Defendant also testified that she did not shoot the victim and had called 911 before the shooting happened, and her sister testified that she had told trial counsel about a prior restraining order against the victim enjoining him from physically assaulting defendant. *O'Banner*, 215 Ill. App. 3d at 789. On appeal, this court concluded that trial counsel was ineffective for failing to call defendant and her son to testify that her son fired the shot that killed the victim; for failing to introduce the 911 call placed by defendant which would have corroborated her proffered testimony and contradicted that of a police officer; and for failing to introduce the evidence of the prior restraining order against the victim which would have supported a claim of self-defense. *O'Banner*, 215 Ill. App. 3d at 791-92.

¶ 82 In *People v. Skinner*, 220 Ill. App. 3d 479, 480, 483 (1991), defendant was convicted of residential burglary and filed a postconviction petition alleging that trial counsel was ineffective for failing to cross-examine a witness on his failure to inform police until six months after the burglary that he saw defendant exiting the victim's home, and for failing to call defendant's mother and stepfather to testify that he lived with them rather than at the place of his arrest. On appeal, this court granted defendant a new trial based on the combination of those errors, finding that counsel had "only repeated portions of the direct examination and otherwise attempted no impeachment" during cross-examination of the identification witness, and that the testimony of defendant's mother and stepfather would have corroborated his testimony and contradicted the officers' testimony. *Skinner*, 220 Ill. App. 3d at 484-87.

¶ 83 Finally, in *People v. Solomon*, 158 Ill. App. 3d 432, 435 (1987), defendant was convicted of delivery of a controlled substance and claimed that trial counsel was ineffective for failing to locate a witness and have a defense chemist test the substance. This court granted defendant a new trial, finding that it was improper for counsel to present the defense of entrapment without the proposed witness, and that the failure to have the defense chemist

perform any tests of the substance other than a visual examination amounted to ineffective assistance. *Solomon*, 158 Ill. App. 3d at 437.

¶ 84      We find defendant's reliance on *Tate* to be misplaced. Unlike that case, defendant has already had the equivalent of an evidentiary hearing in the hearing on his motion for a new trial. The evidence he chose to present included affidavits and an electronically signed letter from his proposed witnesses, and the court ultimately found his claim to be without merit.

¶ 85      *O'Banner*, *Skinner*, and *Solomon* are also distinguishable from the case at bar, as none of those cases involved a situation such as this, where the victim's family has been implicated in either failing to recognize or, worse, covering up the victim's sexual abuse. As noted above, testimony from the victim's family in this situation could have the unintended consequence of harming defendant's case, rather than helping it, and for this reason, the cases cited by defendant are unpersuasive.

¶ 86                                    B. Evidence of Abortion

¶ 87      Defendant next contends that he was denied a fair trial when the trial court allowed the State to present evidence that R.C. was forced to undergo an abortion. He argues that evidence of R.C.'s abortion was irrelevant and served no purpose other than to arouse sympathy for her and hostility and contempt for him.

¶ 88      The State responds that defendant has forfeited this issue by failing to object at trial. The State also responds that evidence of the abortion was properly admitted where defendant referred to it in his confession, and that the procedure and circumstances surrounding it were necessary to explain R.C.'s delayed outcry. In reply, defendant claims that he preserved this issue by raising it in a pretrial motion *in limine* and a motion for a new trial, citing *People v. Hudson*, 157 Ill. 2d 401, 434-35 (1993).

¶ 89      We initially note that there is confusion in our criminal case law regarding whether a motion *in limine* is by itself sufficient to preserve an issue for appeal. This confusion stems from our supreme court's statement in *Hudson* that an issue is preserved for review if it is raised in a motion *in limine* and in a posttrial motion (*Hudson*, 157 Ill. 2d at 434-35), which appears to be in conflict with other supreme court decisions requiring a trial objection and a written posttrial motion to preserve an issue for review (*Simmons v. Garces*, 198 Ill. 2d 541, 569 (2002); *People v. Enoch*, 122 Ill. 2d 176, 186 (1988)). We need not resolve this conflict here because defendant did not properly preserve this issue either in a motion *in limine* or by a trial objection.

¶ 90      "A specific objection at trial forfeits all grounds not specified." *People v. Lovejoy*, 235 Ill. 2d 97, 148 (2009). However, "[a]n issue raised by a litigant on appeal does not have to be identical to the objection raised at trial, and we will not find that a claim has been forfeited when it is clear that the trial court had the opportunity to review the same essential claim." *Lovejoy*, 235 Ill. 2d at 148.

¶ 91      Here, defendant's oral motion *in limine* sought "to bar the State from asking questions about pregnancy or abortion" on the grounds that the State could not prove those facts with R.C.'s testimony, which he claimed would be hearsay. He now objects, however, that admission of the abortion testimony was prejudicial. Since "[t]he claim defendant raises on

appeal is significantly different from the claim he raised below," we find that his claim is forfeited. *Lovejoy*, 235 Ill. 2d at 148. We also find that defendant has forfeited plain error review by failing to argue for it. *People v. Hillier*, 237 Ill. 2d 539, 545-46 (2010).

¶ 92      Even on the merits, though, defendant has failed to show that admission of the abortion testimony was improper. "Evidence is considered 'relevant' if it has any tendency to make the existence of any fact that is of consequence to the determination of an action more or less probable than it would be without the evidence." *People v. Illgen*, 145 Ill. 2d 353, 365-66 (1991). The trial court has discretion to exclude relevant evidence if its prejudicial effect substantially outweighs its probative value. *People v. Eyler*, 133 Ill. 2d 173, 218 (1989). "In this context, prejudice means 'an undue tendency to suggest decision on an improper basis, commonly an emotional one, such as sympathy, hatred, contempt, or horror.' " *Eyler*, 133 Ill. 2d at 218 (quoting Michael H. Graham, Cleary and Graham's Handbook of Illinois Evidence § 403.1, at 148 (4th ed. 1984)). "The admissibility of evidence at trial is a matter within the sound discretion of the trial court, and that court's decision may not be overturned on appeal absent a clear abuse of discretion." *Illgen*, 145 Ill. 2d at 364.

¶ 93      Here, contrary to defendant's claim, R.C.'s testimony regarding her abortion was clearly relevant to show that defendant sexually assaulted her because she would not have required the procedure otherwise. The result of her pregnancy also shed light on her subsequent state of mind, which was clearly at issue in this case. Defendant, himself, concedes that evidence of R.C.'s pregnancy was admissible at trial; thus, we see no reason why the jury should have been kept uninformed about the end result of that pregnancy, which was also relevant. Given the already highly taboo facts of this case, where defendant was charged with repeated sexual abuse of his younger adopted sister during her formative years, with the adoptive mother helping to cover it up, any prejudice to defendant was minimal. Furthermore, the abortion testimony may have actually hurt R.C. more than defendant depending on the jurors' feelings about that issue.

¶ 94      We additionally note that during the trial, defense counsel cross-examined R.C. by confronting her with a letter she had written to a friend regarding her having been sexually assaulted. A teacher saw R.C. crying while writing the letter, recovered it, and this is how the police were notified in 2004. Defense counsel also cross-examined R.C. regarding an e-mail she had sent her sister, Robin C., in which R.C. said she had been impregnated by someone named Jeff. Defense counsel then referred to the abortion procedure in his own closing argument. Finally, defendant's new posttrial counsel presented an affidavit from Robin C. which addressed the abortion procedure, as well as a letter from Dr. Perlow which addressed R.C.'s pregnancy. *People v. Villarreal*, 198 Ill. 2d 209, 227 (2001) (noting that where "a party acquiesces in proceeding in a given manner, he is not in a position to claim he was prejudiced thereby" (internal quotation marks omitted)).

¶ 95      We note that *People v. Feldmann*, 314 Ill. App. 3d 787 (2000), and *People v. Ehlert*, 274 Ill. App. 3d 1026 (1995), cited by defendant, are clearly distinguishable from the case at bar. In *Feldmann*, 314 Ill. App. 3d at 788-89, 799, defendant was charged with the murder of her newborn baby, and the trial court excluded evidence of her previous abortion to avoid undue prejudice to her. On review, this court noted:

"It was clearly within [the trial court's] discretion to weigh relevancy against excessive prejudice and exclude evidence of the abortion and evidence of the prior pregnancy's duration, even though those facts were highly relevant on the question of this defendant's state of mind. It was also clearly within the trial judge's discretion to have admitted a far more damaging version of the defendant's prior pregnancy. He could have allowed evidence of the pregnancy's duration and the circumstances surrounding its termination." *Feldmann*, 314 Ill. App. 3d at 799.

¶ 96    In *Ehlert*, 274 Ill. App. 3d at 1028, defendant was similarly charged with the murder of her newborn baby. She moved to bar evidence of two prior abortions, but the court found them relevant to determining whether she knew that she was pregnant. *Ehlert*, 274 Ill. App. 3d at 1028. On appeal, this court found that the trial court abused its discretion in admitting evidence of the two abortions because the prejudicial effect of that evidence far outweighed its probative value. *Ehlert*, 274 Ill. App. 3d at 1034. The court noted that the State presented evidence that defendant gave birth to two children and had prenatal medical care during those pregnancies, which showed that "she probably knew how pregnancy felt." *Ehlert*, 274 Ill. App. 3d at 1034.

¶ 97    Here, unlike *Feldmann* and *Ehlert*, defendant is not charged with the death of a newborn baby; he is instead charged with the sexual assault of R.C. We find this to be a crucial distinction because, unlike *Feldmann* and *Ehlert*, where evidence of an abortion could have suggested defendants' propensity for killing babies, the abortion testimony in this case would not establish defendant's propensity for sexual assault. We further note that evidence of R.C.'s resulting pregnancy and abortion in this case were directly relevant as the products of the crime with which defendant was charged, unlike in the cited cases where the abortions occurred prior to the offenses. We thus find *Feldmann* and *Ehlert* to be inapposite.

¶ 98    Defendant further complains that evidence of R.C.'s abortion was presented in such a manner as to cause the jury to believe it was material because it was raised during her direct examination and repeatedly referred to in the State's closing arguments. This claim has no merit either. The mere fact that R.C. testified regarding her abortion does not suggest that it was presented as "material," and the State's initial reference to R.C.'s abortion in closing arguments was minimal. As for the State's lengthier discussion of the abortion in rebuttal, that argument was specifically invited by defense counsel's closing argument which questioned the State's proof of the procedure.

¶ 99                          C. Inferences of Other Sexual Abuse

¶ 100   Defendant further contends that he was denied a fair trial when the State suggested to the jury that he had also sexually abused other adopted siblings. He argues that the State's questioning violated the court's pretrial order which disallowed any reference to other alleged victims, and resulted in irrelevant and extremely prejudicial evidence being presented to the jury.

¶ 101   The State responds that defendant has forfeited review of "almost all" the questioning of which he now complains, with the exception of one question that was properly objected to and raised in a posttrial motion. The State also responds that its questioning was neither

-21-

improper nor deprived defendant of a fair trial.

¶ 102     We agree with the State that defendant has forfeited review of those questions and answers to which he did not object. Although both defendant and the State claim that there was a motion *in limine*/court order regarding the mention of defendant's other victims, no such motion or order can be found in the record. The State withdrew its motion *in limine* to present other crimes evidence prior to trial, and the court order to which defendant refers, *i.e.*, the court's statement that "I want to be very certain that there is not even a hint of any other alleged victim," was a comment made during a conversation with the parties about the editing of defendant's audiotaped statement. As with the previous issue, defendant's failure to raise this issue in a motion *in limine* clearly results in the forfeiture of those questions and answers to which he did not object (*People v. Maldonado*, 398 Ill. App. 3d 401, 415 (2010)), and he has likewise forfeited plain error review by failing to argue for it (*Hillier*, 237 Ill. 2d at 545-46).

¶ 103     Forfeiture notwithstanding, we reject defendant's claim that the State's questioning of Detective Caldwell was improper. The allegedly improper questioning cited by defendant includes the following exchange on direct examination of Detective Caldwell:

"BY [assistant State's Attorney]:

Q. At that time did you, in fact, take protective custody of [R.C., Michael C., and Melissa C.]?

[Defense counsel]: Objection.

THE COURT: Basis?

[Defense counsel]: Judge, based upon the motion in limine.

THE COURT: Overruled.

BY THE WITNESS:

A. I'm sorry. The question again, please.

BY [assistant State's Attorney]:

Q. Did you take protective custody of [R.C., Michael C., and Melissa C.]?

A. Yes, ma'am."

It also includes the following questions and answers of Detective Caldwell on redirect:

"Q. Isn't it true that prior to the defendant stating to you 'I'm guilty. I did all of those bad things to my sisters,' you never told him what the allegations–never discussed the allegations against him, did you?

A. No.

* * *

Q. During that conversation with the defendant, you also spoke to him about other matters not related to this investigation; isn't that correct?

A. Yes.

Q. The recorded statement that we all heard in court here yesterday was the defendant's statement regarding [R.C.] only; isn't that correct?

-22-

A. Yes, ma'am."

¶ 104    Defendant claims that the State was attempting to suggest with this questioning that he had sexually abused other adopted siblings in violation of the court's pretrial ruling. This claim is without merit. First, it is clear that the State did not actually bring up that defendant sexually abused another sibling, as evident from the wording of defendant's claim, which is that the State "repeatedly inferred to the jury" that he sexually abused other adopted siblings. See *People v. Taylor*, 237 Ill. 2d 68, 76 (2010) (defendant's characterization of his statement as an " 'implicit claim of ineffective assistance of counsel' " was an acknowledgment that he never specifically complained about his attorney's performance or expressly stated that he was claiming ineffective assistance of counsel). Second, defendant ignores the fact that after counsel elicited testimony from Detective Caldwell on cross-examination that his conversation with defendant was "roughly 45, 50 minutes," the court ruled during a sidebar that the State could address the discrepancy between the length of the conversation and the tape presented to the jury by asking the detective on redirect, "[I]sn't it true that during this other period of time we were talking about other matters?"

¶ 105    Finally, the questioning at issue is a far cry from that in *People v. Liner*, 356 Ill. App. 3d 284 (2005), cited by defendant. In that case, defendant was charged with home invasion and armed robbery. *Liner*, 356 Ill. App. 3d at 286. At trial, the State engaged in various forms of misconduct, including eliciting prejudicial testimony regarding defendant's sale of illegal drugs, suggesting that defendant's Cadillac and nice clothes had been procured therefrom, and asking a question that referred to his drug purchase in the face of his responsibility to support his elderly relatives. *Liner*, 356 Ill. App. 3d at 292-94. This court found that the cumulative effect of the errors prejudiced defendant and denied him a fair trial. *Liner*, 356 Ill. App. 3d at 291. Here, the questioning of Detective Caldwell was not so obviously prejudicial as to deny defendant a fair trial, as in *Liner*, and we therefore reject defendant's claim.

¶ 106                            D. Jury Instruction Error

¶ 107    Defendant lastly contends that the trial court erred in giving IPI Criminal 4th No. 3.11 in its modified form, *i.e.*, without the paragraph allowing the jury to consider a witness' prior inconsistent statement as substantive evidence, because R.C.'s letter to Katelyn was admissible as substantive evidence. The State responds that R.C.'s letter was not admissible as substantive evidence because it was not inconsistent with her trial testimony, and thus the trial court properly tendered only the first and last paragraphs of IPI Criminal 4th No. 3.11.

¶ 108    "Jury instructions are intended to provide the jury with accurate legal principles to apply to the evidence so it can reach a correct verdict." *People v. Campbell*, 2012 IL App (1st) 101249, ¶ 44 (citing *People v. Pierce*, 226 Ill. 2d 470, 475 (2007)). "The decision of whether to tender a particular instruction lies with the trial court and is reviewed under an abuse of discretion standard." *Campbell*, 2012 IL App (1st) 101249, ¶ 44 (citing *People v. Mohr*, 228 Ill. 2d 53, 65-66 (2008)). An abuse of discretion occurs when the instructions

are unclear, mislead the jury, or are not justified by the evidence and the law. *Campbell*, 2012 IL App (1st) 101249, ¶ 44 (citing *People v. Lovejoy*, 235 Ill. 2d 97, 150 (2009)).

¶ 109    In the case at bar, defendant claims that the trial court erred in omitting the following paragraph of IPI Criminal 4th No. 3.11 from the instruction tendered to the jury:

"[However, you may consider a witness's earlier inconsistent statement as evidence without this limitation when

***]

[2] the statement narrates, describes, or explains an event or condition the witness had personal knowledge of;

and

[a] the statement was written or signed by the witness." IPI Criminal 4th No. 3.11.

This portion of IPI Criminal 4th No. 3.11 corresponds to section 115-10.1 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-10.1 (West 2010)) which states:

"In all criminal cases, evidence of a statement made by a witness is not made inadmissible by the hearsay rule if

(a) the statement is inconsistent with his testimony at the hearing or trial, and

(b) the witness is subject to cross-examination concerning the statement, and

(c) the statement–

***

(2) narrates, describes, or explains an event or condition of which the witness had personal knowledge, and

(A) the statement is proved to have been written or signed by the witness[.]"

¶ 110    The general rule is that when reviewing the adequacy of instructions, a reviewing court must consider all of the instructions as a unit to ascertain whether they fully and fairly cover the law. *People v. Luckett*, 273 Ill. App. 3d 1023, 1034 (1995). "Failure to instruct the jury regarding the use of prior inconsistent statements as substantive evidence does not require reversal unless there is a reasonable probability that the outcome of the trial would have been changed had the jury been properly instructed." *People v. Fierer*, 260 Ill. App. 3d 136, 148 (1994).

¶ 111    We find that the trial court abused its discretion by failing to instruct the jury with the second paragraph of IPI Criminal 4th No. 3.11. R.C.'s letter to Katelyn stating that her boyfriend raped her in the woods was inconsistent with her trial testimony that this incident never occurred and that it was defendant who had raped and impregnated her. The letter also described an event of which R.C. had personal knowledge, she acknowledged under oath that she wrote the letter, and she was subject to cross-examination concerning the statement. The second paragraph of IPI Criminal 4th No. 3.11 thus clearly applies here. 725 ILCS 5/115-10.1 (West 2010).

¶ 112    Notwithstanding, the failure to give this instruction was harmless error under the

-24-

circumstances. In *Luckett*, 273 Ill. App. 3d at 1035, the trial court declined to instruct the jury with IPI Criminal 3d No. 3.11 based on its conclusion that an omission in a police report was not a prior inconsistent statement. On appeal, this court explained:

"An instruction regarding the credibility of a witness's testimony in the light of inconsistencies is a cautionary one. [Citation.] As a result, the circuit court has considerable discretion in deciding whether to give such an instruction, particularly where the inconsistency is doubtful. [Citation.] In this case, the refusal to instruct the jury as to this point did not leave the jury without adequate guidance. As this court has noted, 'It is obvious to the layman that any contradiction of a witness' testimony calls into question the accuracy of that testimony, and if that testimony is disbelieved as to one matter, the veracity of the remainder is cast in doubt.' [Citation.] The jury here heard the contradictions in the officers' testimony. Furthermore, the court instructed the jury that, in considering the testimony of any witness, 'to take into account his ability to and opportunity to observe, his memory, his manner while testifying, any interest, bias or prejudice he may have and *the reasonableness of his testimony considered in the light of all of the evidence in the case*.' (Emphasis added.) For this reason, the court did not err in refusing defendant's proffered instructions." *Luckett*, 273 Ill. App. 3d at 1035.

¶ 113    The court's analysis in *Luckett* favors a finding of harmless error in the instant case. Here, as in *Luckett*, the trial court's refusal to instruct the jury that it could consider R.C.'s prior inconsistent statement as substantive evidence did not leave the jury without adequate guidance. The jury was specifically instructed that "[t]he believability of a witness may be challenged by evidence that on some former occasion he made a statement that was not consistent with his testimony in this case." The jury was also instructed that it was for them "to determine whether the witness made the earlier statement and, if so, what weight should be given to that statement." Having been so instructed, the jury found R.C. credible enough to convict defendant of sexual assault. This is a clear indication that even if the jury had been instructed that it could consider R.C.'s prior inconsistent statements as substantive evidence it would not have done so. See *People v. Williams*, 264 Ill. App. 3d 278, 291 (1993) (finding that any error in failing to instruct the jury regarding the substantive use of prior inconsistent statements was harmless where their substantive use was indistinguishable from their impeachment use).

¶ 114    *People v. Wetzel*, 308 Ill. App. 3d 886 (1999), cited by defendant, is distinguishable from the case at bar. In that case, the State contended at defendant's first degree murder trial that either he or his companion fatally shot the victim. *Wetzel*, 308 Ill. App. 3d at 887. The defense theory was that defendant had fired his gun at a wall, not at the victim, and thus the angle at which he had fired his gun became an important issue in the case. *Wetzel*, 308 Ill. App. 3d at 887, 895. A hot dog stand wall was to the west of him, and the vacant lot from which the victim emerged was to the northwest. *Wetzel*, 308 Ill. App. 3d at 895. Chicago police officer Otero testified that defendant had been aiming in a northwest direction, but was impeached with her reports stating that defendant had been firing westward. *Wetzel*, 308 Ill. App. 3d at 895. At the instructions conference, defense counsel requested that the second paragraph of IPI Criminal 3d No. 3.11 be given, but the

trial court refused and instead limited use of the statements to the weight to be given the witness' testimony. *Wetzel*, 308 Ill. App. 3d at 896. This court found that refusal to be error "concerning a seriously disputed issue in the case," and comparing the case to *People v. Zurita*, 295 Ill. App. 3d 1072 (1998), noted that "the fact that the statements were admitted for impeachment purposes did not minimize the prejudice caused by excluding substantive use." *Wetzel*, 308 Ill. App. 3d at 896.

¶ 115     Here, unlike in *Wetzel*, defendant gave a confession in which he admitted to sexually assaulting R.C. Since it is clear from his conviction that the jury found his confession credible, it cannot be said there is a reasonable probability the outcome of his trial would have been different if the jury had been instructed that R.C.'s letter could be considered as substantive evidence, rather than for impeachment purposes only. *Fierer*, 260 Ill. App. 3d at 148. Defendant's reliance on *Wetzel* is therefore misplaced.

¶ 116     For the reasons stated, we affirm the judgment of the circuit court of Cook County.


¶ 117     Affirmed.